# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 03-2508 & 03-2912

SCA TISSUE NORTH AMERICA LLC,

*Petitioner-Cross-Respondent*,

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent-Cross-Petitioner.*

———————

Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board.
No. 28-CA-17548

———————

ARGUED JANUARY 20, 2004—DECIDED JUNE 15, 2004

———————

Before CUDAHY, KANNE, and EVANS, *Circuit Judges.*

KANNE, *Circuit Judge.* SCA Tissue North America LLC fired union supporter Frederick Sandoval on September 24, 2001. The company claimed the termination stemmed from Sandoval's violation of SCA's "Code of Conduct" policy when, on two consecutive mornings, he left work three hours early without management's permission. The National Labor Relations Board ("NLRB" or "Board") disagreed, finding that SCA acted out of anti-union animus in

violation of §§ 158(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.* ("NLRA" or "Act"). It ordered Sandoval reinstated and made whole for lost earnings and benefits, required that his employment record be expunged of any reference to the discharge, and directed SCA to post a notice to its employees that it will respect their rights under the Act. SCA petitioned this court for review of the Board's order, and the Board cross-petitioned for enforcement of its decision. Because the Board's determination is supported by substantial evidence, we deny SCA's petition for review and enforce the Board's order.

## I. Background

SCA manufactures paper products for commercial use. Sandoval began his employment with SCA in 1995, soon after it opened its Bellemont, Arizona plant.[1] He started as a machine operator and was eventually moved to a maintenance mechanic position in May of 2000, which he held until his termination in September of 2001. As a maintenance mechanic, he repaired machines and performed preventative maintenance on SCA's equipment. His personnel file reflected some performance problems early in his career with SCA, but the last documented occurrence happened in January of 1999, over two-and-a-half years prior to his termination and before he obtained the maintenance mechanic position. None of the prior issues appeared to have resulted in formal discipline, and Sandoval was considered a good employee. At all times relevant here, Dave Stievo, the maintenance manager, was Sandoval's immediate supervisor.

---

[1] Although the unfair labor practice of which Sandoval complained occurred in Arizona, the company's headquarters are located in Neenah, Wisconsin. We thus have jurisdiction under 29 U.S.C. § 160(f).

In September of 2000, the Paper, Allied-Industrial, Chemical, and Energy Workers International Union ("PACE" or "union") initiated an organizing drive at SCA's Bellemont location. Sandoval strongly supported unionization and furthered the effort by passing out fliers and union authorization cards to fellow workers, attending organizational meetings, and discussing the merits of unionization with co-workers. Upon receiving notification that the union had enough support to hold a representation election, the company launched a vigorous counter campaign in an attempt to defeat PACE. SCA succeeded. The employees voted against union representation eighty-two to twenty-two in the election held December 1 and 2, 2000.

Sandoval was disappointed by the defeat, but understood that, according to the applicable labor law, another election could be held after one year. In the interim, he continued to vocally support unionization and press his fellow employees not to make the same mistake in the next election.

SCA operates around the clock, seven days a week. Maintenance employees, like Sandoval, typically work twelve-hour shifts, either 6:00 a.m. to 6:00 p.m. ("days") or 6:00 p.m. to 6:00 a.m. ("nights"). Sandoval worked days. In the fall of 2001, the company planned to put a member of the night-shift maintenance crew on a special day-shift assignment for about six weeks. To cover the twenty shifts left vacant by the temporary reassignment, Stievo determined that four day-shift workers, including Sandoval, would take five night shifts apiece. Although Sandoval was supposed to work 6:00 p.m. to 6:00 a.m. when he covered the night shift, he had already registered for a special electrical course promoted by the company. To accommodate his night class, which ran from approximately 6:00 p.m. to 8:45 p.m., Stievo agreed that Sandoval could work 9:00 p.m. to 9:00 a.m.

Sandoval began his first night shift (which started the evening of September 18, 2001 and concluded the morning

of September 19, 2001) at 9:00 p.m. after attending class. Around 4:00 a.m., he approached the night supervisor, team leader Laura Bliss, and told her that he was tired, felt "unsafe" to work in that condition,[2] and asked to go home. Bliss did not give him permission to leave, instead directing him to wait in the lunchroom for Stievo to arrive for work. Sandoval waited, periodically checking for Stievo, but by 6:00 a.m. he had not yet arrived and Bliss had left for the day. A member of the day-shift maintenance crew, Mike Moberly, who reported for work at 6:00 a.m., caught sight of Sandoval. Moberly commented that Sandoval looked tired and told him to go home, since the floor would be covered now that the day shift was starting (this is a paraphrase, as Moberly spoke to Sandoval in far more colorful terms). Considering he had "coverage" and that Stievo still had not arrived, Sandoval clocked out and left. As he was driving out, Stievo drove in. Sandoval waved, and Stievo waved back. Stievo, who didn't recall seeing Sandoval leave, testified that he did not realize Sandoval clocked out early the morning of September 19, 2001 and did not miss him on the floor.

Sandoval reported for his next shift (beginning the evening of September 19 and concluding the morning of September 20) after class at 9:00 p.m. as scheduled. After arriving, he was approached by fellow maintenance employee Dan Harbottle. Although Harbottle usually worked 9:00 a.m. to 9:00 p.m., he informed Sandoval that he would come in at 6:00 a.m. if Sandoval wanted to leave early. Sandoval agreed. He again clocked out at 6:00 a.m. when the day shift reported and before Stievo arrived. He did not seek Bliss's or any other supervisor's permission to leave. As

---

[2] The Bellemont plant's general manager, Mike Graverson, had informed employees at a safety meeting earlier that month that if anyone felt unsafe performing a specific duty, they should refuse to do so and inform a supervisor.

Sandoval was leaving, he spoke with the regularly sched-uled day-shift worker, Dave Hetzler. Hetzler warned Sandoval that he could get in trouble for leaving early without permission, but Sandoval replied that he was too tired to stay, that he could afford an "occurrence" under the company's attendance policy as he had no prior attendance issues, and that there was plenty of coverage since Hetzler and Harbottle were both on the floor.

That morning, September 20, 2001, another maintenance employee informed Stievo that Sandoval left work early that day and the day before. Stievo investigated by inter-viewing Moberly and Hetzler and by checking the time clock and gate log entries. He did not contact Sandoval. After confirming that Sandoval did leave early on September 19 and 20 and after discussing the issue with the company's on-site human resources generalist, Beth Moser, and with general manager Graverson, Stievo decided that Sandoval's actions constituted a terminable offense under SCA's "Code of Conduct" policy, as opposed to an attendance issue. Un-der the "Code of Conduct" policy, progressive discipline, although the norm, could be bypassed if an offense was serious enough. In contrast, offenses falling under SCA's separate attendance policy were always subject to progres-sive discipline.

Stievo and Moser met with Sandoval on September 24, 2001 after he reported to work on his regular day shift. Stievo told Sandoval that he was terminating him for job abandonment because he left work early two days in a row without permission. Sandoval protested that he did not abandon his job, that he had coverage both days, and that he had spoken to Bliss the first day about needing to leave and why. Since Stievo had not interviewed Bliss, he decided to reserve judgment on the termination until after he spoke with her. He sent Sandoval home and told him he would call him with his decision after he contacted Bliss. Stievo then reached Bliss at home and asked her if she had given

Sandoval permission to leave, which she denied. She did confirm, though, that Sandoval approached her about being tired and needing to go home. According to Stievo, he now believed Sandoval lied about receiving permission from Bliss.[3] Stievo felt the termination for job abandonment was warranted, and he telephoned Sandoval with the news.

Sandoval later arranged to return to the plant to re-trieve his personal effects. As he was walking through the plant, escorted by Stievo, he removed his jacket to reveal his T-shirt, which was bright red with the words "Work Union" printed on the back in five-inch white letters. Stievo demanded that Sandoval put his jacket back on, which Sandoval ignored. After Sandoval reached his toolbox to collect his property, Stievo made a comment about Sandoval's "attitude."

On October 30, 2001, PACE filed an unfair labor practice charge against SCA as a result of Sandoval's termination. Based on the charge, the Board issued a complaint against SCA on December 26, 2001. The case was heard by an administrative law judge ("ALJ"), who found against the company on August 22, 2002. SCA filed exceptions to the ALJ's decision, and the Board affirmed the ALJ's determi-nations (with minor changes, which will be discussed as necessary below) and adopted his recommended order on April 30, 2003. This appeal followed.

---

[3]  Moser and Stievo both testified that Sandoval specifically stated in the termination meeting that he had received "permission" from Bliss to leave. Sandoval denied ever making such a statement and testified that he told them only that he talked to Bliss about needing to leave because he was tired and felt unsafe. The administrative law judge hearing the matter credited Sandoval's testimony over the company's. The Board did not disturb this credibility finding and neither will we.

## II. Analysis

Our review of an NLRB decision is circumscribed: we apply the substantial evidence test to the Board's factual findings and review its legal conclusions for a reasonable basis in law. *Sears, Roebuck & Co. v. NLRB*, 349 F.3d 493, 502 (7th Cir. 2003). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support the conclusion of the Board." *Huck Store Fixture Co. v. NLRB*, 327 F.3d 528, 533 (7th Cir. 2003). "At this stage, we must not 'dabble in fact-finding and may not dispute reasonable determinations simply because we would have come to a different conclusion if we reviewed the case de novo.' " *Id.* (quoting *Livingston Pipe v. NLRB*, 987 F.2d 422, 426 (7th Cir. 1993)); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) (noting that a reviewing court may not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo"). We owe particular deference to the Board's credibility determinations, which we will disturb only in "extraordinary circumstances." *Sears, Roebuck & Co.*, 349 F.3d at 503. Where the Board adopts the ALJ's findings of fact and conclusions of law, it is the ALJ's determinations that we review. *See id.* at 508.

The NLRA guarantees employees' rights to form, join or assist labor organizations and to engage in activities for the purpose of collective bargaining. *See* 29 U.S.C. § 157; *Huck Store Fixture Co.*, 327 F.3d at 533. Here, the Board found SCA violated § 158(a)(1), which makes it unlawful for employers to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [§ 157]." It also determined SCA violated § 158(a)(3), which prohibits employers from taking adverse actions against employees to discourage them from engaging in union activities, *Huck Store Fixture Co.*, 327 F.3d at 533.

If SCA fired Sandoval because of his union activities, it triggers liability under both §§ 158(a)(1) and (3). *Sears, Roebuck & Co.*, 349 F.3d at 503 (citing *Jet Star, Inc. v. NLRB*, 209 F.3d 671, 675 (7th Cir. 2000)). To establish a prima facie case of discrimination, the General Counsel, responsible for prosecuting complaints before the Board, bears the burden of showing: "(1) that the employee engaged in a protected activity; (2) the decisionmaker knew it; and (3) the employer acted because of anti-union animus." *Id.* If the General Counsel succeeds, the company must either rebut that evidence or mount an affirmative defense that the company would have taken the same action despite the employee's protected activities, as outlined in the seminal case *Wright Line, a Division of Wright Line, Inc.*, 251 NLRB 1083 (1980), *approved by NLRB v. Transportation Management Corp.*, 462 U.S. 393 (1983). *Sears, Roebuck & Co.*, 349 F.3d at 504.

## A.  Prima Facie Case

The company concedes the first two elements of the prima facie case—that Sandoval engaged in protected activity and Stievo knew it.[4] Instead, it asserts that the Board wrongly determined that SCA acted because of anti-union animus. We note that discerning an employer's motivation is a question of fact, and, as with other factual findings made by the Board, its determination is conclusive if supported by substantial evidence, either direct or circumstantial. *See*

---

[4] Despite the company's clear concession of the first two prima facie elements in its opening brief, it goes on to argue in its reply that the decisionmaker, Stievo, was unaware of Sandoval's union activities. It was wholly improper for SCA to do so, and we consider that argument waived. *See Marie O. v. Edgar*, 131 F.3d 610, 614 n.7 (7th Cir. 1997) ("We do not consider arguments raised for the first time in the reply brief.").

*NLRB v. So-White Freight Lines, Inc.*, 969 F.2d 401, 408 (7th Cir. 1992).

The Board pointed specifically to four incidents that revealed SCA's intent to terminate Sandoval because of his protected activity: (1) plant manager Graverson's warning to all employees during the 2000 campaign that they could not talk about the union on the shop floor; (2) Stievo's order to Sandoval, again during the 2000 campaign, to remove his union button because it ostensibly violated SCA's "no jewelry" policy; (3) Stievo's order to Sandoval after his termination to cover up his union T-shirt as they walked through the shop; and (4) Stievo's parting comment about Sandoval's "attitude." The Board did not rely, as did the ALJ, on the fact that the company hired a consultant to help it with its counter campaign, that Graverson broke down in tears during a meeting with employees during the campaign, or that Sandoval's termination took place shortly before another union election could be held.

As to the Board's first two points, Graverson and Stievo both admitted that they probably took the actions attributed to them during the campaign. SCA argues, though, that instructing employees not to discuss the union while on the floor and refusing to allow union buttons were simply applications of uniformly enforced policies prohibiting non-work-related conversations and jewelry. We agree that uniform application of neutral work rules generally would not enlighten the Board as to a company's motivation for terminating an employee. Yet, SCA failed to convince the Board that it uniformly applied the rules; rather, the Board adopted the ALJ's determinations that the ban on non-work-related conversations did not actually exist and that the no-jewelry policy had never been enforced, at least with respect to wedding rings, watches, and SCA pins.

Our review of the record convinces us that the Board based these determinations on substantial evidence. Nei-

ther policy was uniformly enforced, if enforced at all, prior to or after the campaign. The Board was entitled to rely on these instances of selective policy application as evidence of anti-union animus. Assuming that the union knew about management's unrefuted actions during the campaign, it could have brought unfair labor practice charges for Graverson's prohibition on union-related conversations and Stievo's insistence that Sandoval remove his union button. Both likely violated the NLRA and thus demonstrated animus. *See, e.g., Atlas Metal Parts Co., Inc. v. NLRB*, 660 F.2d 304, 311 (7th Cir. 1981) (prohibition on talking about union on shop floor violated § 158(a)(1) of the Act); *NLRB v. Shelby Mem'l Hosp. Ass'n*, 1 F.3d 550, 564-65 (7th Cir. 1993) (ordering employees to remove union patches based on uniform policy not previously enforced violated § 158(a)(1)). Although the time frame for bringing unfair labor practice charges for events occurring during the 2000 campaign actions has long since passed, the Board could consider the incidents in its attempt to unearth the true motivation behind Sandoval's termination. *See Local Lodge No. 1424, Int'l Assoc. of Machinists v. NLRB*, 362 U.S. 411, 416 (1960) (noting that events outside the six-month statute of limitations for bringing unfair labor practice charges may be used to "shed light on the true character" of occurrences within the statute of limitations).

As to the last two instances credited by the Board, SCA again does not attempt to deny that Stievo did and said the things attributed to him the day Sandoval came to retrieve his personal effects. Rather, the company argues that it has a right to control disruptive outbursts on the production floor, regardless of their nature, and Stievo's request that Sandoval cover his union T-shirt was just that. It also contends that Stievo's follow-up comment was innocu-ous—Stievo, during testimony, described it as an unpro-voked attempt to give Sandoval some fatherly advice about life skills in general, which included maintaining a positive

attitude. The Board rejected the company's position and adopted the ALJ's conclusions that Stievo's demand that Sandoval cover his shirt demonstrated anti-union animus and that Stievo's "attitude" comment was not innocuous, but directly reflected on his opinion of Sandoval's pro-union stance.

Again, both conclusions are supported by substantial evidence. Even if we credited Stievo's account of Sandoval's walk through the plant (the ALJ found Stievo generally incredible), he only describes employees "acknowledging" Sandoval and Sandoval acknowledging them in return.[5] Sandoval testified that only one employee, upon seeing his shirt, made a comment, which was, "That's right, Fred. If we were Union, they couldn't do that to you." The scene described by Stievo and Sandoval does not leave the impression that Sandoval's behavior created a disturbance warranting Stievo's command to cover the shirt—no one stopped worked, left their machines, began chanting, applauded, or otherwise threatened chaos. Based on the record evidence, the Board could reasonably conclude that Stievo's reaction to Sandoval's shirt revealed Stievo's intent to crush union ideation, not to maintain order on the production floor. The Board could also reasonably conclude that Stievo's "attitude" comment, coming as it did on the heels of Sandoval's public pro-union display, reflected his negative opinion of Sandoval's pro-union stance and was not an attempt to provide benign fatherly advice.

SCA argues that events occurring after termination are insignificant to determining a company's motivation at the time of the discharge, and thus the Board should have ignored Stievo's post-termination behavior. We disagree. *See,*

---

[5]  Contrary to the representation in its opening brief, there is no mention in the record that Sandoval pumped his arms in the air after removing his jacket.

*e.g.*, *NLRB v. Rich's Precision Foundry, Inc.*, 667 F.2d 613, 619-20, 626 (7th Cir. 1981) (finding employer's stated reason for employee's discharge pretextual based in part on post-termination statement offering employee his former job back if he would abandon the union). The Board's consideration of Stievo's post-termination behavior, and the inference of anti-union animus drawn therefrom, was proper.

To summarize, each instance relied upon by the Board as evidence of SCA's anti-union animus finds substantial support in the record. Taken together, we find that they are adequate to support the Board's conclusion that SCA terminated Sandoval because of his protected activities.

## B. Affirmative Defense

The Board adopted in full the ALJ's determination that SCA failed to rebut the General Counsel's prima facie case or to establish the *Wright Line* affirmative defense. SCA argues in response that its stated reason for terminating Sandoval was not pretextual and that even if Stievo harbored anti-union animus, Sandoval would have been terminated anyway under SCA's policies because he left work early two days in a row without permission.

Unfortunately for SCA, the record is replete with examples of other employees with terrible employment histories who also committed "Code of Conduct" violations and received written warnings or suspensions, as opposed to the ultimate sanction, termination.[6] This led the ALJ, and now

---

[6] The ALJ noted that no truly analogous situation existed—one where an employee left without permission two days in a row. However, he found SCA's treatment of four other employees, not known to be union supporters and occurring within the relevant

(continued...)

leads us, to ponder why SCA repeatedly salvaged employees' careers after numerous policy violations but refused to do so for Sandoval, a good employee with a clean record and long tenure with the company.

The ALJ concluded that examples of past leniency, coupled with testimony from management that the company tried to be flexible and consider mitigating circumstances when meting out punishment, were simply inconsistent with SCA's insistence that Sandoval's actions warranted termination. Sandoval, the ALJ noted, was a senior employee with a spotless attendance record, unlike many of the non-union supporters who committed comparative offenses but kept their jobs. Looking at the infraction itself, the ALJ noted that on the two days he left work early, Sandoval clocked out only after he had coverage, so pro-

---

[6] (...continued)

time frame, particularly instructive. In one instance, the employee had repeated attendance problems, bouts of sleeping on the job, and a positive drug test. He was given at least one "final warning" before he was ultimately terminated for napping at work. In another circumstance, an employee with past attendance problems and safety violations received a one-week suspension for fraudulently listing his girlfriend and her daughter as dependents for insurance purposes even though he was still married to another woman. The company planned to fire him, but backed down after he explained that he mistakenly believed he had a right to list his girlfriend as his wife. In still another case, an employee with far less seniority than Sandoval was cited for poorly maintained equipment, attitude problems, and a "no call no show." Despite this deeply flawed employment record, including his failure to show up at work at all on one occasion, he received no greater discipline than a written warning. Finally, the ALJ noted a fourth employee who sexually harassed female employees, called a shift leader a foul name in front of other employees, and made a racist remark, but ultimately received only a written reprimand.

duction was not jeopardized by his absence. The company refused to consider Sandoval's mitigating circumstances: he tried to get permission on the first occasion but left after waiting two hours for Stievo to arrive; he believed that leaving early was an attendance violation subject to progressive discipline; he thought his behavior was excused in any event because he had coverage before he left; and he was exhausted, and thus felt unsafe to work, because he was attending a company-promoted night class, working night shifts at the company's request to cover for a reassigned employee, and working his regular day shift. The ALJ concluded that the only explanation for the company's overly harsh treatment of Sandoval was his pro-union stance and that the "Code of Conduct" citation was just a pretext for discrimination. Thus, SCA failed to prove that it would have terminated Sandoval absent his protected activities.

In light of the record as a whole, we find that the ALJ's determination that SCA failed to rebut the General Counsel's prima facie case or prove its *Wright Line* affirmative defense is supported by substantial evidence. SCA's past willingness to give second and third chances to poor employees with a myriad of performance problems, but not to Sandoval, smacks of disparate treatment. *See Great Lakes Warehouse Corp. v. NLRB*, 239 F.3d 886, 891 (7th Cir. 2001) (finding that disparate disciplinary treatment of a union supporter can support a determination that a company violated § 158(a)(3) and defeat a company's *Wright Line* affirmative defense). Indeed, this is a case where SCA's asserted justification for its termination decision—the alleged "Code of Conduct" violation—appears to have "furnished the excuse rather than the reason" for the discharge. *NLRB v. Thor Power Tool Co.*, 351 F.2d 584, 587 (7th Cir. 1965), *quoted in Justak Bros. & Co. v. NLRB*, 664 F.2d 1074, 1077 (7th Cir. 1981). This might well have been a different case, or no case at all, had SCA chosen not

to levy the ultimate punishment against Sandoval. But it did, and the Board's order must be enforced.

### III. Conclusion

For the foregoing reasons, we DENY SCA's petition for review and ENFORCE the Board's Order.

A true Copy:

      Teste:

                        _____
                        *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*