# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 10-3213, 10-3701, 10-3872 & 11-1011

ROCHELLE WASTE DISPOSAL, LLC,

*Petitioner/Cross-Respondent,*

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner,*

and

INTERNATIONAL UNION OF OPERATING
ENGINEERS, LOCAL 150, AFL-CIO,

*Intervening Respondent/Cross-Petitioner.*

Petitions for Review and Cross-Applications
for Enforcement of Orders of the
National Labor Relations Board.
Nos. 33-CA-15298, 33-CA-15765 & 33-RC-5002.

ARGUED SEPTEMBER 19, 2011—DECIDED MARCH 8, 2012

Before EASTERBROOK, *Chief Judge,* and KANNE and
WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge*. Rochelle Waste Disposal, LLC, the employer in this action, operates a municipal landfill in Rochelle, Illinois. At the time of the events leading to this dispute, the employer had five permanent employees, including Jeff Jarvis, the central character in this drama. Jarvis worked under the title "Landfill Supervisor," but as we shall soon have to ask ourselves, "What's in a name?" Jarvis and two other employees began to discuss the possibility of unionizing, but when faced with the possibility of a bargaining unit being formed, Rochelle Waste Disposal asserted that Jarvis was, as his title suggested, a "supervisor" and therefore ineligible for inclusion. The dispute was heard by the Regional Director of the National Labor Relations Board, who found that Jarvis was not, in fact, a supervisor. Eight days before the election, Jarvis was terminated for what Rochelle Waste now says was an egregious violation in failing to cover the landfill's garbage. At the time of his firing, Jarvis was told he was being let go because of a reduction in force. Regardless, Jarvis cast a vote, and the final vote tally was 3-2 in favor of unionizing. Rochelle Waste challenged the ballot and refused to bargain with the newly formed collective bargaining unit. An Administrative Law Judge found that Jarvis was improperly discharged.

The National Labor Relations Board affirmed the decision of the Regional Director that Jarvis did not have supervisory status, and the Administrative Law Judge's finding that Jarvis was improperly terminated. Rochelle Waste seeks review of those decisions, and the General Counsel of the Board has filed cross-applications for

enforcement of the orders. We conclude that although Rochelle Waste called Jarvis a "supervisor," the Board's determination that he lacked authority "responsibly to direct" other employees under section 2(11) of the National Labor Relations Act, 29 U.S.C. § 152(11), contains no legal error and is supported by substantial evidence. We also find that the Board's conclusion that Jarvis was discharged based on his protected union activity is supported by substantial evidence. We therefore deny the employer's petition for review and grant the General Counsel's application for enforcement of the Board's orders.

## I. BACKGROUND

Rochelle Waste Disposal ("Rochelle Waste") operates Municipal Landfill Number 2, a landfill owned by the City of Rochelle, Illinois. Rochelle Waste is co-owned by Clyde Gelderloos and Winnebago Reclamation Service, an entity owned by William Waste Companies. Gelderloos is also an owner of Rochelle Disposal Services, a separate waste hauling company that provides waste to the landfill.

As of January 2007, the landfill had five permanent employees (Jeff Jarvis, Tracy Spires, Joe Nelson, Matt Cater, and Mike Grubic) and two temporary employees. Jarvis had worked as a truck driver for Rochelle Disposal Services from August 1992 until December 1993, and began working for Rochelle Waste at the landfill on January 27, 2004. Jarvis spent eighty to ninety-five percent of his day running heavy equipment, and the remainder of his day operating pumps, servicing equip-

ment, and performing special tasks. Jarvis held a Class A Solid Waste Site Operator's Certificate as issued by the Illinois Environmental Protection Agency ("IEPA"), and Illinois law requires that landfills have at least one certificate holder on staff. 225 ILCS 230/1004. The exact nature of Jarvis's job and daily tasks is much disputed and discussed in greater detail below. Jarvis's title at Rochelle Waste was "Landfill Supervisor."

In mid-August 2008, Jarvis and two other Rochelle Waste employees, Grubic and Cater, began discussing the possibility of organizing a union. The three met with an organizer from the International Union of Operating Engineers, Local 150, and signed union authorization cards. On August 18, the Union filed a representation petition with the National Labor Relations Board ("NLRB" or "Board") to represent Rochelle Waste's scale and heavy equipment operators. But Rochelle Waste challenged the proposed bargaining unit on the ground that Jarvis's "Landfill Supervisor" position was supervisory under Section 2(11) of the National Labor Relations Act ("NLRA"). *See* 29 U.S.C. § 152(11). Such a designation would render Jarvis ineligible for inclusion in the bargaining unit. Hearings were conducted, and Jarvis testified before a hearing officer of the Board in the presence of Gelderloos. On September 28, 2006, the Regional Director of the NLRB issued a Decision and Direction of Election, finding that Jarvis's "Landfill Supervisor" position was not, as the title suggested, supervisory. The Regional Director's decision included Jarvis in the bargaining unit and directed a secret-ballot election.

Shortly thereafter, the NLRB issued its decision in *Oakwood Healthcare Inc.*, 348 NLRB 686 (2006), in which the Board reassessed its interpretation of certain section 2(11) terms relevant to the determination of supervisory status in light of the Supreme Court's decision in *NLRB v. Kentucky River Cmty. Care, Inc.*, 532 U.S. 706 (2001). Rochelle Waste filed what the Regional Director considered a motion for reconsideration, and the Regional Director vacated his opinion relating to supervisory status and reopened the proceedings for another hearing. Jarvis testified at a second hearing, and Gelderloos was again present. The Regional Director issued a Supplemental Decision and Direction of Election which reaffirmed his prior determination that Jarvis was not in a supervisory position and again directed a secret-ballot election, scheduled for February 1, 2007. Rochelle Waste filed a request for review with the Board, which was denied.[1]

Meanwhile, in October 2006, the City of Rochelle applied for approval from the Ogle County Solid Waste Management Department to expand the landfill. The

---

[1] The decision of a regional director becomes final either if the parties fail to request a review by the Board or the Board denies such a request. *See* 29 C.F.R. § 102.67(f); *see also NLRB v. Friendly Cab Co., Inc.*, 512 F.3d 1090, 1102 (9th Cir. 2008); *see also Magnesium Casting Co. v. NLRB*, 401 U.S. 137, 138 n.2 (1971) ("Denial of a request for review shall constitute an affirmance of the regional director's action . . . ."). We refer to the Regional Director's decision throughout this opinion as the decision of "the Board."

landfill had a history of IEPA-issued violations, including one dated September 15, 2006 based on a lack of compliance with the "cover" requirement. IEPA regulations require that the "working face" of the landfill be covered at the end of each day, typically with soil, tarps, sand, or demolition debris, in order to contain odors, repel animals, and prevent blowing litter. Rochelle Waste claims that Tom Hilbert, the company's Engineering Manager, informed Jarvis about the September violation and the need to be in compliance during the expansion application process, and that Jarvis's responsibilities included verifying that the working face was properly covered. However, Rochelle Waste's employees, including Jarvis, claim that the company never informed them of any environmental violations and that no employee was disciplined for such violations. On January 5, 2007, the Ogle County Solid Waste Management Department accepted a compliance commitment from Rochelle Waste to resolve the cover violation that led to the September 15, 2006 citation.

On Saturday, January 13, 2007, before any decision on the expansion application, Ogle County conducted an unannounced, after-hours inspection of the landfill because of complaints about uncovered waste. The inspector found uncovered waste and tarps to the side of the waste that could have been used for cover, but were not. Jarvis, Grubic, and Cater all testified that the garbage was adequately covered before they left the landfill that Saturday morning. After the hearings on the landfill's expansion plan, Rochelle Waste was cited and fined $500 for the January 13, 2007 violation. Ogle

County eventually granted Rochelle Waste's and the City of Rochelle's expansion plan with certain conditions.

On January 16, 2007, Gelderloos informed Rochelle Waste's full-time employees that Evan Buskohl, then Environmental Compliance Officer for William Charles Waste Companies, would be taking over as Operations Manager of the landfill. Rochelle Waste claims that this change was made in response to the January 13 violation. The General Counsel of the Board denies that there was any correlation, pointing to Gelderloos's later statement that, "Well, when Mr. Jarvis decided he was not a supervisor, I had to hire a supervisor."

Rochelle Waste claims that shortly after Buskhol was brought in, the landfill lost one of its major customers, and that the waste volume at the site declined. Buskhol claims that as a result, Rochelle did not need all of its current employees to operate the landfill, and that a reduction in force was necessary. Buskhol met individually with each employee and had each one fill out a self-evaluation form. He decided to keep Tracy Spires based on her expertise as a scale house operator, and decided to keep another employee, Joe Nelson, because he was the most senior and the company was accommodating a worker's compensation injury he suffered. Of the three other employees (who coincidentally were the three seeking to unionize), Buskhol evaluated each employee's skill level with various equipment. He asked Matt Cater whether he would be interested in a transfer to the hauling company if a position became available, but Cater said he preferred to stay at the landfill.

Later that day, Buskohl and Gelderloos's son met with Jarvis. Buskohl informed Jarvis that the landfill was overstaffed and that he had to terminate someone. Buskohl explained that he had evaluated the workforce, and "that someone was going to be [you, Jarvis]." Jarvis asked why. Buskohl repeated that he had "evaluated the workforce" and that Jarvis was the one "he had chosen." Buskhol later stated at the hearings that one of the deciding factors was the January 13 cover violation, and that Jarvis was responsible for the daily cover. However, this was not articulated to Jarvis at the time of firing on January 22, 2007, which was eight days before the pre-scheduled NLRB election. A letter to Jarvis dated January 25, 2007 states only that he was terminated due to a "necessary permanent reduction in force." The Union challenged Jarvis's firing.

The employees went ahead with the pre-scheduled election on February 1, 2007. Jarvis cast a ballot, which resulted in a 3-2 vote in favor of the bargaining unit. Rochelle Waste challenged Jarvis's ballot on the basis that he was not an employee, which was consolidated with the Union's challenge to Jarvis's firing as unlawful. An Administrative Law Judge ("ALJ") held hearings on the issues, and then issued a decision finding that Jarvis's discharge was a violation of sections 8(a)(1), (3), and (4) of the National Labor Relations Act, 29 U.S.C. § 158(a). A two-member Board adopted the ALJ's ruling in its entirety. Rochelle Waste subsequently filed a petition for review in this court and the General Counsel of the Board filed a cross-application for enforcement.

Following the Board's ruling, the Union was certified as the employees' exclusive collective bargaining representative on November 6, 2008. The Union requested that Rochelle Waste bargain collectively with it, but Rochelle Waste refused, causing the Union to file a complaint with the Board challenging Rochelle Waste's refusal to bargain. The Regional Director entered summary judgment against Rochelle Waste for its refusal to bargain in violation of sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a), and a two-member Board subsequently issued a decision affirming the Regional Director's ruling. Rochelle Waste filed another petition for review with this court, and the General Counsel filed a cross-application for enforcement.

We consolidated Rochelle Waste's petitions for review and the General Counsel's cross-applications, but after oral argument we remanded the cases to the Board in light of the Supreme Court's intervening decision in *New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635 (June 17, 2010). In that case, the Supreme Court held that in order to exercise the delegated authority of the Board, a panel of the Board must consist of three members.

On August 23, 2010, the Board issued an order by a three-member panel that adopted and affirmed the previous decision finding that Jarvis was not a supervisor and that both his termination and the failure to count his ballot violated the NLRA. Rochelle Waste filed a petition for review in this court, and the Board filed a cross-application for enforcement of the order. On Decem-

ber 13, 2010, the Board issued another order by a three-member panel finding that Rochelle Waste wrongfully refused to bargain. The Board filed for enforcement, and Rochelle Waste filed a petition for review. We again consolidated the appeals, granted the Union leave to intervene, and heard re-arguments.

## II. ANALYSIS

This court will enforce the NLRB's orders if its factual findings are supported by substantial evidence and its conclusions have a reasonable basis in the law. *Bloomington-Normal Seating Co. v. N.L.R.B.*, 357 F.3d 692, 694 (7th Cir. 2004) (citing *Dilling Mech. Contractors, Inc. v. NLRB*, 107 F.3d 521, 523-24 (7th Cir. 1997)). The substantial evidence test "requires not the degree of evidence which satisfies the *court* that the requisite fact exists, but merely the degree that *could* satisfy the reasonable fact finder." *FedEx Freight E., Inc. v. NLRB*, 431 F.3d 1019, 1025-26 (7th Cir. 2005) (quoting *ATC Vancom of Cal. v. NLRB*, 370 F.3d 692, 695 (7th Cir. 2004)) (emphasis in original). We give particular deference to the Board's credibility determinations, "which we will disturb only in extraordinary circumstances." *Id*. at 1026 (citing *SCA Tissue N. Am. v. NLRB*, 371 F.3d 983, 988 (7th Cir. 2004)).

## A. The Board's Conclusion that Jarvis Lacked Supervisory Status Is Supported By Substantial Evidence

Section 2(3) of the National Labor Relations Act excludes from the definition of employee "any individual

employed as a supervisor." 29 U.S.C. § 152(3). Any individual employed as a supervisor, therefore, is not eligible to be included in a bargaining unit. Section 2(11) states:

> The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). Individuals are considered statutory supervisors "if (1) they hold the authority to engage in any 1 of the 12 listed supervisory functions, (2) their exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment, and (3) their authority is held in the interest of the employer." *NLRB v. Kentucky River Cmty. Care, Inc.*, 532 U.S. 706, 713 (2001) (internal quotation marks and citation omitted). We apply a deferential standard of review to the Board's determination of supervisory status because "it rests, at least in part, on a factual finding." *NLRB v. GranCare, Inc.*, 170 F.3d 662, 666 (7th Cir. 1999); *see also NLRB v. Meenan Oil Co.*, 139 F.3d 311, 320 (2d Cir. 1998) ("Supervisory status within the meaning of Section 2(11) of the NLRA is a question of fact . . . .") (citation omitted). "As the issue is primarily one of fact, the Board's determination regarding

the supervisory status of an employee will not be over-turned as long as substantial evidence exists to support the Board's finding." *NLRB v. Adam & Eve Cosmetics, Inc.*, 567 F.2d 723, 726-27 (7th Cir. 1977) (citation omitted).

Before moving on, we describe in some greater detail Jarvis's daily tasks and responsibilities. Jarvis testified that he reported to Gelderloos, and that his typical work-day began at 5:00 a.m. and normally ended around 4:00 p.m. depending on when the last dump trucks came in. He spent his first hour servicing equipment so that the equipment was ready to run by 6:00 a.m., and testified that the maintenance manuals directed the schedule for the servicing of equipment. Jarvis ad-mitted that he was responsible for hauling enough cover dirt on a daily basis. Beyond that, he stated that "there are certain other tasks that Clyde [Gelderloos] and I discuss sometimes," such as grinding yard waste, "seeding" slopes for grass growth, loading and moving fences, and watering roads to prevent dust. Jarvis also testified that some of these tasks were understood as routine jobs. When asked whether he assigned work to other employees, he stated that each employee had a specific set of tasks and was assigned to specific equip-ment, and that "they know their duty every day." Jarvis stated that he only monitored other employees' work to the extent it affected his own tasks, (such as ensuring that the garbage was placed in a way that allowed daily cover), and that he was never disciplined or repri-manded because another employee was not doing his or her job properly. Jarvis was familiar with IEPA guide-

lines and the requirements to cover the working face and prevent debris from being windblown.

Other employees testified that on occasion, Jarvis asked them to call the city electric company when power was down (characterized as "requests"), or that he would arrange for coverage when one employee was out. There was conflicting testimony as to whether Jarvis granted vacation days, with Tracy Spires testifying that on one occasion she received approval from Jarvis, but that on other occasions it was Gelderloos who granted leave. On one occasion, Jarvis made a statement to one of the machine operators that the operator was allowing his machine to "idle" for too long. There was also conflicting testimony as to whether Jarvis had the authority to decide who stayed and who did not when the landfill was kept open late, but there were no specific instances mentioned when Jarvis actually exercised this alleged authority.

The parties disagree as to whether Jarvis had authority "responsibly to direct" other employees as meant by Section 2(11) of the NLRA.[2] To establish that an em-

---

[2] The Board also found that Rochelle Waste had failed to establish by a preponderance of the evidence that the landfill supervisor "assigned" employees under section 2(11) or that he exercised independent judgment when making assignments. Specifically, the Board found that Jarvis lacked authority to assign lunch periods, grant vacation time, or assign or compel overtime tasks. Rochelle Waste does not appear to challenge the "assignment" findings of the Board.

ployee has the authority responsibly to direct another co-worker, the employee must be accountable for the co-worker's performance. *Loparex LLC v. NLRB*, 591 F.3d 540, 549 (7th Cir. 2009) (citing *Adam & Eve Cosmetics, Inc.*, 567 F.2d at 728). The Board addressed this part of the statute in *Oakwood Healthcare, Inc.*, 348 NLRB 686, 691-92 (2006), finding that "for direction to be 'responsible,' the person directing and performing the oversight of the employee must be accountable for the performance of the task by the other, such that some adverse consequence may befall the one providing the oversight if the tasks performed by the employee are not performed properly." Additionally, an employee must have "authority to take corrective action, if necessary" and be subject to negative consequences for a failure to take such action. *Loparex LLC*, 591 F.3d at 549-50 (quoting *Oakwood Healthcare, Inc.*, 348 NLRB at 692).

The Board found that although there were some instances where Jarvis directed equipment operators as to the placement of garbage, the direction was sporadic and there was no evidence that such direction was "responsible." According to the Board, Rochelle Waste failed to establish by a preponderance of the evidence that Jarvis was "held accountable" for the performance of other employees, and it found that there was insufficient evidence that Jarvis could "take any action to correct the work performance of the employees."

To address the "corrective action" finding first, Rochelle Waste argues that the Board misapplied the legal standard by conflating "corrective action" and

"disciplinary action," the latter of which is separately listed in section 2(11) as a ground for finding supervisory status. 29 U.S.C. § 152(11) ("The term 'supervisor' means any individual having authority, in the interest of the employer, to . . . discipline other employees . . . ."). In *Loparex LLC v. NLRB*, the employer brought a challenge to the Board's holding in *Oakwood Healthcare* on the ground that the Board read into the statute an additional requirement that a supervisor must have the capacity to take "corrective actions." 591 F.3d at 550. The employer in *Loparex* argued that section 2(11) of the Act already had a separate reference to "discipline," and that requiring "corrective action" as part of "responsibly to direct" would read the "disciplinary action" phrase out of the statute. *Id*. We disagreed, finding the Board's reading in *Oakwood Healthcare* permissible. We stated that "the reference to responsible direction in section 2(11) of the Act may be ambiguous," and that we therefore owe *Chevron* deference to the Board's decision in *Oakwood Healthcare*. *Id.* (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)). And we found that "the Board is entitled to take the position that it would be incongruous to hold someone accountable for the conduct of others she could not control or *correct*." *Id*. (citation omitted) (emphasis added). At the same time, we noted that "the Board must be careful to distinguish between corrective and disciplinary action in order to ensure that each part of section 2(11) has meaning." *Id*. at 550. We provided the following example: "[A]n employee might be said to take corrective action if she requires a coworker to stay late to complete a project that has fallen behind schedule.

Placing this small burden on the employee, however, would not amount to disciplinary action that could affect the employee's job status." *Id*. at 550-51.

In this case, Jarvis made a "statement" to an equipment operator that the operator was idling his machine too long. The Board found that there was "no evidence [Jarvis's] statement lead [sic] to any personnel actions or had any impact on the employee. Such 'oral reprimand,' therefore, does not constitute disciplinary authority." Rochelle Waste contends that this reference to disciplinary authority shows that the Board conflated corrective and disciplinary action, which they claim flies in the face of *Oakwood Healthcare* and *Loparex*. We disagree. First, the Board found that in the examples put forth by Rochelle Waste as evidence of Jarvis taking corrective action (where the owner told Jarvis about two employees not conducting their work properly), "[t]he owner did not state what actions, if any, [Jarvis] took to correct these performance problems." This finding is independent of any discussion of discipline, and is supported by the record. Second, to the extent the Board addressed the claim that Jarvis had told another employee to stop idling in the context of "disciplinary authority," it was Gelderloos himself who offered that example when asked for examples of Jarvis doling out discipline. Regardless, in the example we gave in *Loparex* to distinguish corrective and disciplinary action, we stated that "an employee might be said to take corrective action if she *requires* a coworker to stay late to complete a project . . . ." 591 F.3d at 550-51 (emphasis added). Corrective action, to be corrective, must have some force behind it or place some

"small burden on the employee." *Id.* at 551. In this case, the Board made a specific finding that Jarvis's statement did not have "any impact on the employee," and Rochelle Waste does not point to anything in the record showing this to be untrue. Rochelle Waste has not shown that the equipment stopped idling because Jarvis placed a burden or requirement on the employee, nor have they shown that the operator should have stopped idling because of such a burden or requirement. We find that the Board did not misapply a legal standard, and we are satisfied that the Board's conclusion that Jarvis lacked authority to take corrective action is supported by substantial evidence.[3]

Rochelle Waste also challenges the Board's findings on accountability, namely, that the Board erred in finding that Jarvis did not suffer "adverse consequences" for the performance of other employees. The Board's error,

---

[3] Gelderloos did testify to telling Jarvis that an equipment operator was not running a particular machine correctly, and that he told Jarvis that the "employee has to stop—the employee's actions have to be corrected." Gelderloos also testified that he informed Jarvis that a particular employee had to work faster to spread waste. Jarvis denied that the owner instructed him to take any actions with respect to correcting the employee's performance. The Board found that Gelderloos "did not state what actions, if any, [Jarvis] took to correct these performance problems," and it found no corrective action. Rochelle Waste does not argue that this finding was a misapplication of the "responsibly to direct" standard, and we find it to be a factual determination that is supported by substantial evidence.

Rochelle Waste contends, was focusing on whether Jarvis had, in fact, suffered such consequences, rather than examining if he was at risk for suffering such consequences. According to Rochelle Waste, scouring the record for *actual* instances of adverse consequences exempts those supervisors whose supervision is done well. (The irony in Rochelle Waste's later claim that Jarvis performed so poorly as to be fired is not lost on us). The proper inquiry, however, is whether the purported supervisor is at risk of suffering adverse consequences for the actual performance of others, not his own performance in overseeing others. *Mars Home for Youth v. NLRB*, 666 F.3d 850, 2011 WL 5068084, at \*2 (3d Cir. 2011); *see also Oakwood Healthcare*, 348 NLRB at 691-92 (focusing on the "adverse consequence" that "befall[s] the one providing the oversight if the *tasks performed by the employee* are not performed properly" (emphasis added)). Regardless, this is not a case where the other employees had perfect performance. Gelderloos testified that there were two occasions on which equipment operators were performing inadequately, and that he informed Jarvis of this. Though Gelderloos characterized his discussion with Jarvis as an "oral reprimand," the Board found no evidence that Jarvis actually suffered an "adverse consequence" as a result of the conversations. Where a lower level employee performs inadequately, and the purported supervisor is in fact not held accountable, it highly supports a finding that the purported supervisor is not actually at risk of suffering adverse consequences.

Rochelle Waste points to Jarvis's Illinois Class A Solid Waste Site Operator's Certificate as evidence that he

*would be* held accountable for the inadequate per-formance of others. The Illinois statute relevant to that certificate requires that "the landfill has on its opera-tional staff at least one natural person certified," and further states that, "[f]or landfill sites which accept non-hazardous solid waste other than clean construction or demolition debris, the landfill shall have a Class A Solid Waste Site Operator certified by the Agency who is *responsible for directing* landfill operations or *supervising* other operational staff in performing landfill operations." 225 ILCS 230/1004(a) (emphasis added). This Illinois statute, however, does not answer the question of whether Jarvis is a supervisor under the NLRA. Gelderloos admitted that he also held the license, and all that is required under the Illinois Statute by its plain terms is that the landfill have "a" certificate holder on staff who is responsible for directing operations, not two holders, and not someone "on-site" at all times, as Rochelle Waste claims. Gelderloos's license and clear managerial role therefore satisfies 225 ILCS 230/1004. Regardless, the Board has specifically held that "paper accountabil-ity," (accountability in name or job description only), is by itself insufficient to establish supervisory authority. *Golden Crest Healthcare Center*, 348 NLRB 727, 731 (2006) (citing *Training School at Vineland*, 332 NLRB 1412, 1416 (2000)). Here, though Gelderloos testified that he hired Jarvis because of his license and would have fired him if he lost it, the Board found that this was never communicated to Jarvis and found no evidence that holding the license actually correlated to accountability under the NLRA. Rochelle Waste does not point to any-thing in the record that shows that simply holding the

license actually put Jarvis "at risk" of an adverse conse-
quence for the poor performance of other employees,
and we therefore do not disturb the Board's findings.

In sum, we do not find that the Board committed legal
error in addressing "corrective action" or Jarvis's account-
ability under the NLRA, and find that the Board's
factual determinations are supported by substantial
evidence.[4]

### B. The Board's Conclusion that Jarvis's Termination Was Retaliatory Is Supported by Substantial Evidence

Rochelle Waste also challenges the Board's decision
affirming an ALJ's finding that it violated § 8(a)(3) and (4)
of the NLRA, 29 U.S.C. § 158(a)(3), (4), by discharging
Jarvis in retaliation for his union activities and his testi-
mony before the Board.[5] Here, the Board must make an

---

[4] Because we find that the Board's conclusion that Jarvis
lacked authority "responsibly to direct" contained no error of
law and was supported by substantial evidence, we do not
reach Rochelle Waste's argument that the Board erred in its
alternative finding that if Jarvis did direct other employees,
he did not exercise "independent judgment" in doing so.

[5] 29 U.S.C. § 158(a) states in relevant part:

It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the
exercise of the rights guaranteed . . .

(continued...)

initial showing that "antiunion animus was a substantial or motivating factor in the employer's decision." *NLRB v. Joy Recovery Tech. Corp.*, 134 F.3d 1307, 1314 (7th Cir. 1998); *see also Wright Line, a Div. of Wright Line, Inc.*, 251 NLRB 1083 (1980). Once the Board does so, the burden shifts to the employer to prove that it had a legitimate business reason for making its decision. *Joy Recovery Tech. Corp.*, 134 F.3d at 1314. Discerning an employer's motivation is a question of fact, and, as such, the Board's "determination is conclusive if supported by substantial evidence, either direct or circumstantial." *SCA Tissue North America LLC v. NLRB*, 371 F.3d 983, 988-89 (7th Cir. 2004) (citing *NLRB v. So-White Freight Lines, Inc.*, 969 F.2d 401, 408 (7th Cir. 1992)).

Here, substantial evidence supported the Board's conclusion that Rochelle Waste violated § 8(a)(3) and (4) by terminating Jarvis. No one disputes that Jarvis began engaging in protected activity five months before his termination and that Rochelle Waste was aware of his

---

[5] (...continued)

> (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . .

> (4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter . . . .

A violation of subsection (a)(3) has been held to be a "derivative violation of" subsection (a)(1). *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 698 n.4 (1983).

activity (since Gelderloos attended the hearings regarding Jarvis's supervisory status). The ALJ noted that Gelderloos (bitterly) claimed to have been forced to hire a "supervisor" once Jarvis "decided he wasn't" one, but that the record showed that no one in fact was hired; rather, the parent company's compliance manager, Evan Buskohl, came to the landfill but did not appear on any payroll documents. Additionally, the ALJ found that had another pro-union employee, Matt Cater, chosen to take a position at the separate hauling company, Jarvis would not have been terminated (since, apparently, the 3-2 vote in favor of forming the bargaining unit would then have been a tie). The ALJ also noted the timing of Jarvis's firing: Gelerloos admitted that he had never fired an employee in thirty-seven years, but terminated Jarvis eight days before the representation election. And evidence showed that once Jarvis left, Gelderloos had to be on site more often, and temporary workers were brought in, calling into question the articulated rationale of a workforce reduction.

Rochelle Waste makes much of the January 13, 2007 cover violation and suggests that it was Jarvis's role in this violation that led to his termination. Rochelle Waste argues that the ALJ ignored evidence that Jarvis was warned about the lack of adequate cover. But the evidence to that effect did not conclusively show that a "warning" actually took place. Although engineering manager Tom Hilbert testified to speaking with Jarvis about the importance of the cover, Jarvis only admitted that Hilbert spoke to him about "issues related to construction and demolition debris," and not about any

EPA daily cover violations. We rely on the ALJ's firsthand consideration of this evidence. *See Slusher v. NLRB*, 432 F.3d 715, 727 (7th Cir. 2005) ("'[O]n matters which the [ALJ], having heard the evidence and seen the witnesses, is best qualified to decide, the agency should be reluctant to disturb his findings unless error is clearly shown.'") (quoting *Universal Camera v. NLRB*, 340 U.S. 474, 494 (1951)).

   What is more relevant to Rochelle Waste's proffered legitimate business reason for Jarvis's firing is that the company did not investigate to determine responsibility for the January 13 violation, as found by the ALJ. And, more importantly, Rochelle Waste never articulated to Jarvis at the time of his firing that this termination had anything to do with the violation that occurred less than ten days prior. The company only told Jarvis that it was overstaffed and needed a reduction in force. Such a change in rationale can be inferred against the employer. *See, e.g., NLRB v. Hotel Employees and Restaurant Employees Int'l Union Local 26*, 446 F.3d 200, 208 (1st Cir. 2006) ("The ALJ was free to eye with a good deal of suspicion any reasons later generated during litigation.") (citing *NLRB v. Waco Insulation, Inc.*, 567 F.2d 596, 601 (4th Cir. 1977) ("We believe that it is extremely unlikely that the reason for [an employee's] discharge was due to [the proffered reason] since it was not articulated as a reason for his discharge at the time he was fired.")). The Board's findings regarding Jarvis's discharge are supported by substantial evidence, and we do not disturb them.

### III. CONCLUSION

For the reasons discussed above, we DENY Rochelle Waste's petition for review and GRANT the General Counsel's application for enforcement of the Board's orders.