[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 11-12000, 11-12638

_____

N.L.R.B. Case No. 12-CA-27044

LAKELAND HEALTH CARE ASSOCIATES, LLC,

Petitioner-Appellant-Cross-Appellee,

versus

NATIONAL LABOR RELATIONS BOARD,

Respondent-Appellee-Cross-Appellant.

_____

Petitions for Review of a Decision of the
National Labor Relations Board

_____

(October 2, 2012)

Before TJOFLAT and PRYOR, Circuit Judges, and HUCK,* District Judge.

_____

* Honorable Paul C. Huck, Senior United States District Judge for the Southern District of
Florida, sitting by designation.

HUCK, District Judge:

Appellant, Lakeland Healthcare Associates, LLC ("Lakeland"), appeals a decision of the National Labor Relations Board ("Board" or "NLRB") finding Lakeland in violation of sections 8(a)(5) and (1) of the National Labor Relations Act (the "Act"), 29 U.S.C. §§ 158(a)(5), (1), for its refusal to bargain with the United Food and Commercial Workers Union, Local 1625 ("Union"). The Board cross-appeals for enforcement of the decision below. Lakeland admits that it refused to bargain with the Union, but argues that its refusal does not violate the Act because the Union was improperly certified in the underlying representation proceedings (Board Case No. 12-RC-9426). Accordingly, the sole issue on appeal is whether substantial record evidence supports the Board's determination that certain licensed practical nurses ("LPNs")[1] employed by Lakeland are "supervisors" within the meaning of section 2(11) of the Act. For the reasons described below, we vacate the Board's decision and deny the petition for enforcement.

---

[1] All of the LPNs at issue in this case also serve as "team leaders"—a term which Lakeland uses interchangeably with the term "charge nurses." For convenience, we use the term "team leaders" as the umbrella term for both LPNs and Resident Nurses ("RNs") who perform the functions of team leaders / charge nurses. We assign no significance to our use of one term over the other.

I.    BACKGROUND

The facts relevant to this appeal are in all material respects not in dispute. Lakeland is a nursing and long-term care facility that employs LPNs, RNs, and certified nursing assistants ("CNAs"), among other full-time and part-time employees. The Union currently represents all of Lakeland's CNAs.

On August 11, 2010, the Union filed a petition with the Board seeking a representation election to establish the Union as the collective bargaining representative for Lakeland's LPNs. Lakeland opposed the petition, arguing that the LPNs are "supervisors" within the meaning of the Act and are therefore ineligible for union representation. See 29 U.S.C. § 152(11).

Between August 25, 2010 and August 30, 2010, an NLRB hearing officer held a hearing devoted solely to the "supervisor" issue. The parties presented testimony from eight different witnesses, and, following the hearing, submitted substantive briefs to the NLRB's Regional Director for Region 12. On September 24, 2010, after reviewing the record and the briefs, the Regional Director issued a 49-page Decision and Direction of Election ("DDE") finding that the LPNs were not supervisors under the Act.[2] The Board denied Lakeland's request for review

---

[2] As a general rule, NLRB orders in representation proceedings are not reviewable by the courts unless and until the employer has refused to bargain with the union once the union has been certified. See Boire v. Greyhound Corp., 376 U.S. 473, 477-79 (1964). In such cases, section 9(d) of the Act, 29 U.S.C. 159(d), provides that the findings in the underlying

3

of the Regional Director's decision on December 6, 2010, with one member of the three-member panel dissenting.  Following a representation election, the Union was certified on January 6, 2011 as the exclusive bargaining representative for Lakeland's LPNs.

In order to seek judicial review of the Board's findings, Lakeland refused to recognize and bargain with the Union as the LPNs' representative.  The Union responded by filing an unfair labor practice charge with the Board, which, through the Board's general counsel, filed a complaint against Lakeland on February 22, 2011.  On April 29, 2011, the Board entered a 3-page Decision and Order granting summary judgment in favor of the Board's general counsel (and thereby the Union), finding that Lakeland violated sections 8(a)(5) and (1) of the Act.  Lakeland appeals.

## II.    STANDARD OF REVIEW

Because the Board's summary judgment order is predicated on the findings in the underlying representation case, we review the merits of those decisions together on appeal.  See Boire, 376 U.S. at 477-79.  When reviewing an order of the Board, we are "bound by the Board's factual findings if they are supported by

---

representation proceeding are made a part of the record and are subject to review on appeal. Boire, 376 U.S. at 477-79.  We refer to the Regional Director's decision throughout this opinion as a decision of the "Board."

4

substantial evidence on the record as a whole." Int'l Bhd. of Boilermakers v. NLRB, 127 F.3d 1300, 1306 (11th Cir. 1997) (quoting NLRB v. Malta Constr. Co, 806 F.2d 1009, 1010 (11th Cir. 1984); see also 29 U.S.C. § 160(e). The Board's inferences from the record evidence, if plausible, should not be overturned, even if we would have made different findings upon a de novo review of the evidence. Int'l Bhd. of Boilermakers, 127 F.3d at 1306. "[C]redibility resolutions are peculiarly within the province of the [administrative law judge] and the Board and are entitled to deference unless inherently unreasonable or self-contradictory." NLRB v. United Sanitation Serv., 737 F.2d 936, 938 (11th Cir. 1984).

While we have described this standard of review as "exceedingly narrow," NLRB v. Contemporary Cars, Inc., 667 F.3d 1364, 1370 (11th Cir. 2012), and have noted that a "robust application" of the standard has typified review of NLRB decisions, Cooper/T. Smith, Inc. v. NLRB, 177 F.3d 1259, 1262 (11th Cir. 1999), we are not "obliged to stand aside and rubber-stamp [our] affirmance of administrative decisions that [we] deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." Id. at 1261 (alterations in original) (internal quotations and citations omitted). "Substantial evidence is more than a mere scintilla of evidence. 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

5

Contemporary Cars, Inc., 667 F.3d at 1370 (quoting Bickerstaff Clay Prods. Co. v. NLRB, 871 F.2d 980, 984 (11th Cir. 1989)).  "[T]he Board cannot ignore the relevant evidence that detracts from its findings."  Northport Health Svcs., Inc. v. NLRB, 961 F.2d 1547, 1550 (11th Cir. 1992).  "When [it] misconstrues or fails to consider important evidence, its conclusions are less likely to rest upon substantial evidence."  Id.

The burden of establishing the supervisory status of an employee is on the party asserting such status.  NLRB v. Kentucky River Community Care, Inc., 532 U.S. 706 (2001);  Cooper/T. Smith, 177 F.3d at 1263.  Here, that party is Lakeland.

III.    DISCUSSION

A.    Legal Framework

Whether Lakeland is in violation of the Act hinges on whether its LPNs are properly regarded as "employees" or "supervisors."   Under the structure of the Act, if the LPNs are "employees," they are guaranteed the right to unionize.  See 29 U.S.C. § 157 ("Employees shall have the right to self-organization . . . .").  If they are "supervisors," they are not.  See 29 U.S.C. § 152(3) ("The term 'employee' . . . shall not include . . . any individual employed as a supervisor . . . .").

6

Section 2(11) of the Act defines a "supervisor" as:

> any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). Accordingly, an individual is a "supervisor" under the Act if: (1) he or she has the authority to perform one of the twelve supervisory functions described in the statute; (2) the exercise of that authority requires the use of independent judgment; and (3) such authority is held in the interest of the employer. See NLRB v. Health Care & Ret. Corp., 511 U.S. 571, 573-74 (1994) ("HCR").

In this case, there is no dispute as to whether the authority held by Lakeland's LPNs is exercised "in the interest of the employer." See HCR, 511 U.S. at 577 (1994) ("Patient care is the business of a nursing home, and it follows that attending to the needs of the nursing home patients, who are the employer's customers, is in the interest of the employer."). Thus, this appeal focuses on the first two inquires under section 2(11). On the issue of the LPNs' authority, Lakeland argues that the record clearly establishes that the LPNs possess the authority to discipline, suspend, and effectively recommend the termination of the

7

CNAs, and to assign and responsibly direct the CNAs' work. As to the second issue, Lakeland maintains that the exercise of this authority requires the use of independent judgment. Our task is to determine whether the Board's conclusions to the contrary are supported by substantial record evidence.

> B.    Authority to Discipline, Suspend, and "Effectively Recommend" Termination

According to Lakeland, the most compelling reason why the Board's decision should be vacated is because the LPNs, using their own independent judgment and discretion, initiate the process to discipline, suspend, and terminate CNAs. More to the point, Lakeland argues that the Board's decision is not supported by substantial evidence inasmuch as it misconstrues and disregards critical evidence concerning the LPNs' role in the disciplinary process for CNAs.

Lakeland employs a progressive discipline system, which it describes as a "coaching" program. Under the program, employees who engage in misconduct or who are not meeting Lakeland's performance expectations can receive either a "level one" or "level two" "coaching," depending on the severity of the issue. Coachings are prepared by the LPNs, either on their own initiative or at the instruction of management, and may or may not lead to formal discipline. Level two coachings, which are reserved for "serious failures of customer service standards," automatically result in the suspension of the employee pending an

8

investigation and frequently result in termination.  Level one coachings, which are issued for more minor infractions such as tardiness or failing to clock out for lunch, require the employee and his or her "direct supervisor" to agree to a plan to address the issue.  Employees with four active level one coachings are automatically terminated.  We review the evidence related to LPN involvement in level two and level one coachings independently.

### 1.    Level Two Coachings

Lakeland maintains that the LPNs are supervisors under the Act because they have the independent discretionary authority to initiate and implement level two coachings through which they can effectively suspend and terminate CNAs. The Board rejected this argument, reasoning that the record establishes only that the LPNs are responsible for reporting employee misconduct.  That is, according to the Board, to the extent that the LPNs even have disciplinary authority, the exercise of such authority does not require the use of independent judgment.

While we are mindful of the limited nature of our review in this appeal, this is not a case in which we merely disagree with the Board's conclusions.  Our review of the record as a whole reveals that the Board meticulously excluded or disregarded record evidence, which, when taken into account, compels a different result.  See  Northport, 961 F.2d at 1552.

9

With regard to the first prong of the analysis required under section 2(11) of the Act–whether the employee has the authority to perform one of the twelve supervisory functions–the Board rejected Lakeland's testimonial and documentary evidence as being in conflict,  inconclusive, or conclusory.  It was none of these. The written job description for LPN charge nurses (team leaders) provides that the "primary purpose of the Charge Nurse is to provide direct nursing care to the residents, and to supervise the day-to-day nursing activities performed by the [CNAs]."  To this end, LPNs are charged with ensuring, among other things, that nursing personnel: "are in compliance with their respective job descriptions," "are performing their work assignments in accordance with acceptable nursing standards," and "follow the department's established policies and procedures." The job description also provides that LPNs shall "[i]nterpret the department's policies and procedures to personnel, residents, visitors, and government agencies as required," and "[m]ake recommendations for revisions" to the policies and procedures.[3]

The record establishes that the LPNs fulfill these delegated supervisory responsibilities, in part, through Lakeland's coaching program.  Lakeland's

---

[3] The job description also provides under the headings "Leadership" and "Supervisory Authority" that an LPN "[r]eports performance related issues of CNAs to Nursing Supervisor." As discussed below, we do not take this to mean, as the Board suggests, that the LPNs' only role in the disciplinary process is to report employee misconduct.

10

Director of Nursing, Garth Swearingen, testified that the LPNs "are considered to be leaders of their team" and that, if they saw a CNA not performing his or her job correctly, "they certainly would be able to coach them, talk to them, give them a verbal warning, or do any coaching that they would need to do that . . . ." Swearingen further confirmed that the coaching forms prepared and issued by LPNs are for discipline, and, on cross-examination, testified that LPNs are "very capable of coaching somebody at a Level 2, and they're also very capable of suspending any CNA. They're capable of sending them home. This testimony is consistent with Swearingen's testimony elsewhere in the record:

> Q:    And just to clarify the issuance of a Level 2
>       coaching plan, that results in somebody being - -
>
> A:    That's very serious.
>
> Q:    Well, but it results in somebody being told, "Don't
>       come back here 'til the investigation's over,"
>       right?
>
> A:    That's right.
>
> Q:    That's being sent home?
>
> A:    Immediate suspension. That's suspension
>       immediately.
>
> . . . .
>
> Q:    And the team leaders can do that, right?

11

A:    They can.

Q:    And they do?

A:    And they do.  And they have.

This testimony stands uncontradicted.[4]  Moreover it is consistent with the

testimony of Lakeland's Daytime Shift Supervisor, Tammy Baxter, which is also

uncontradicted:

> Q:    Based on your knowledge of the Level 2 coaching
> process, a team leader LPN would have the
> authority to issue a Level 2 coaching, correct?
>
> A:    Yes.
>
> Q:    And under a Level 2 coaching and the facility's
> policy, is an employee automatically suspended
> upon receipt of a Level 2 coaching?
>
> A:    Yes.
>
> Q:    So is it fair to assume that if [an LPN] issued a
> Level 2 coaching to [a CNA] that she would have
> been suspended pending investigation?
>
> A:    She would have sent her home.

Both Swearingen and Baxter followed this testimony with specific examples of

LPNs who effectively suspended or terminated a CNA through the level two

---

[4] At oral argument, the Board was given the opportunity to demonstrate where in the record this testimony was in any respect contradicted.  It failed to do so.

coaching process.  Indeed, Baxter recounted one such example of a level two coaching wherein she personally witnessed an LPN conduct the termination of a CNA.[5]

Nor should this evidence have been disregarded because, according to the Board, the examples cited by Swearingen and Baxter were "isolated" or "sporadic."  As Lakeland points out, given that level two coachings are reserved for the most serious infractions, one would reasonably expect that such occurrences would be infrequent.  Such infrequency does not suggest a lack of disciplinary authority.  Rather, it indicates only that the LPNs had only "isolated" or "sporadic" opportunities to exercise this authority over the CNAs.  The Board's task in this case was to determine whether the LPNs have been delegated the authority to issue level two coachings, and whether, by virtue of that authority, they could effectively discipline, suspend, and recommend the termination of CNAs.  The frequency with which an employee exercises disciplinary authority–authority that, in an ideal workplace, will be exercised infrequently or sparingly–cannot be determinative of the existence of supervisory authority.  See

_____

[5] Both Swearingen and Baxter testified regarding an incident when an LPN issued a level two coaching to a CNA after the CNA permitted a patient to smoke while using supplemental oxygen.  Swearingen testified that the LPN was involved in both the investigation and the decision to terminate the CNA.  Baxter, who testified that she spoke with the LPN who issued the coaching, confirmed these facts.  Baxter also testified that she personally witnessed the LPN perform the CNA's termination.

13

Caremore, Inc. v. NLRB, 129 F.3d 365, 369 (6th Cir. 1997).[6]

With regard to the second prong of the analysis required under section 2(11) of the Act–whether exercise of the authority requires independent judgment–the Board concluded that, in issuing level two coachings, the LPNs merely report employee misconduct to management, after which time management conducts an investigation and determines the appropriate discipline. To be sure, we take no issue with the Board's articulation of the appropriate legal standard. As noted by the Board in Oakwood Healthcare, Inc., 348 N.L.R.B. 686, 693 (2006) ("Oakwood"), the exercise of "independent judgment" is to be contrasted with actions that are "merely routine or clerical." To exercise independent judgment, the individual "must at minimum act, or effectively recommend action, free of the control of others and form an opinion or evaluation by discerning and comparing data." Id at 694. "[A] judgment is not independent if it is dictated or controlled by detailed instructions . . . ." Id. at 693. "[T]he mere existence of company policies," however, "does not eliminate independent judgment from decision-making if the policies allow for discretionary choices." Id.

---

[6] We recognize that, in some cases, the infrequency with which purported authority is exercised may be relevant to determining whether such authority was actually vested in the employee. However, logic dictates that this consideration has little relevance when the authority claimed is the authority to discipline, suspend, or terminate, and the frequency of disciplinary incidents is limited.

Here again, however, the Board conclusion cannot be squared with the record as a whole, which undermines the Board's position that the LPNs merely report misconduct to their superiors and exercise no discretion in the level two coaching process. In reaching its decision, the Board again disregards compelling and uncontradicted evidence to the contrary. For example, Baxter testified that, when she was a team leader, she had the independent authority, which she exercised,[7] to discipline CNAs without involving another level supervisor. She also testified that, upon learning of a CNA's performance issue, she had the discretion to determine whether, based upon the seriousness of the infraction, to prepare a written coaching form or to resolve the issue only by speaking with the CNA directly (i.e., by issuing a verbal warning directly to the CNA). Swearingen likewise testified that, if a team leader learned of a performance issue, they "certainly would be able to coach them, talk to them, give them a verbal warning, or do any coaching that they would need to do that . . . ." He later added, "[t]he LPN can take it on herself to do a Level 2 coaching anytime she chooses to do that . . . ." "[T]hey have full authority at any time, they don't need the direction of

_____

[7] The example cited by Baxter involved a situation wherein a CNA under her supervision was not completing her assigned work, and, when Baxter approached her about the issue, the CNA "got in [her] face" and threatened her. Baxter wrote the CNA up, sent her home, and recommended to Swearingen that she be terminated. The CNA was terminated by the following evening.

15

anybody, at any time that they want to they can write up an employee." This unrebutted testimony establishes that, at a minimum, LPNs possess the discretionary authority to determine whether formal discipline is warranted in the first place. Yet, this testimony did not factor into the Board's analysis of this issue.

The language of Lakeland's employee handbook and level two coaching form also compel the conclusion that the LPNs exercise independent judgment. The employee handbook and the coaching form list over a dozen actions that would constitute violations of Lakeland's level two "customer service standards"–violations that, as noted above, would require a CNA's immediate suspension and, possibly, termination. While it is true that some of these actions, such as "[s]leeping on the job" " or "2 No Call/No Shows," can be identified as violations without the exercise of independent judgment, others, such as "[u]nauthorized disclosure of confidential information," "[n]egligent conduct which results in the damage to the facility, or customer property," "harassment," or "fraudulent activity," plainly cannot. In such cases, finding a CNA in violation of Lakeland's customer service standards (a finding with immediate and severe consequences) necessarily requires the LPN to exercise judgment as to what information is "confidential" and what conduct rises to the level of "negligence,"

16

"harassment," or "fraud." Further, the employee handbook and coaching form also provide that the list of activities described therein that could constitute a level two violation is not exhaustive. In other words, the LPNs can independently determine that yet other actions are sufficiently serious so as to warrant a CNA's immediate suspension pending an investigation.

Critically, rather than focusing on this and other evidence of independent judgment before it, the Board's decision on this issue rests entirely on speculative inferences from what the evidence could or might have shown. For example, the Board clearly placed considerable weight on the fact that the level two coaching form "does not indicate whether the LPN completing the form is the one who suspends the CNA, or whether the LPN does so independently or needs the approval of a nursing supervisor or unit manager." The Board also stressed that the form "does not have a space for any recommendation by the LPN completing the form, and the Level Two coaching plans in the record do not discuss the LPN's recommendation." Be that as it may, the fact that the forms in question could have been drafted differently does not establish, as the Board concluded, that the LPNs who prepared them did not exercise independent judgment. Likewise, the fact that "[n]one of the LPNs who purportedly completed the Level Two coaching plan forms in the record testified" is not reason enough to ignore the undisputed

17

testimony of the managers who testified as to their own knowledge regarding

those LPN coachings.

In light of this uncontradicted testimony, the language of Lakeland's

employee handbook, the LPNs' job description, and the level two coaching forms

in the record, the record as a whole does not support by substantial evidence the

Board's conclusion that the LPNs' role in the level two coaching process is

"merely reportorial."[8]

---

[8] We note that our conclusion is in accord with the Sixth Circuit's decision in Extendicare Health Servs., Inc v NLRB, 182 F. App'x 412 (6th Cir. 2006) and the Fourth Circuit's decision in Glenmark Assocs. v. NLRB, 147 F.3d 333 (4th Cir. 1998). But see NLRB v. Saint Mary Home, 358 F. App'x 255 (2d Cir. 2009); NLRB v . Hilliard Dev. Corp., 187 F.3d 133 (1st Cir. 1999). In Extendicare, the court noted:

> The Board viewed the nurses' "writing up" of assistants' misconduct as a mere "reporting function" that "does not establish supervisory status." We do not think substantial evidence supports the Board's view. First, the record shows that Extendicare's floor nurses have discretionary authority to choose from among several remedial measures, only one of which involves completion of a disciplinary action report. The nurses decide independently whether a nursing assistant's misconduct is severe enough to warrant disciplinary proceedings. As we have held elsewhere, the use of independent judgment in writing up employees' infractions is a supervisory function.
>
> Second, it is undisputed that a floor nurse's completion of a disciplinary action report initiates formal disciplinary proceedings against a nursing assistant. By making such a report, therefore, a nurse plays an effective part in the disciplinary process. The administrator or director of nursing makes the final decision as to whether, and how, an assistant will be disciplined, but the relevant consideration for purposes of § 152(11) is effective recommendation . . . rather than final authority. The Act does not preclude supervisory status simply because a recommendation is

18

2.    Level One Coachings

The Board also determined that the LPNs' involvement in level one coachings does not establish their supervisory status. Specifically, the Board concluded that there is no direct "nexus" between the issuance of level one violations and future disciplinary action. The Board also found that the evidence presented on this issue was either "vague," and should therefore be disregarded, or merely established that level one coachings are issued automatically without the exercise of independent judgment. These conclusions are not supported by the evidence.

As a starting point, the record makes clear that the issuance of level one coachings, in and of itself, is a form of discipline. The employee handbook provides that employees who fail to meet Lakeland's customer service standards will receive a level one coaching plan "developed by the employee and his/her direct supervisor"–in the case of CNAs, an LPN or RN team leader. The level one coaching forms contain a space for the team leader and the CNA to describe the

---

subject to a superior's investigation.

182 F. App'x. at 416-17 (internal quotations and citations omitted) (alternations in original omitted). While the determination of supervisory status must be made on a case-by-case basis, we find this reasoning persuasive.

19

reason for the coaching, the coaching plan, and any additional corrective action or training necessary. The employee's "direct supervisor," who signs the level one coaching form next to the line designated "supervisor signature" or "coach's signature," is charged with "implement[ing]" the plan. The plans "are permanently filed in the employee's personnel file," and, if not satisfactorily completed, "remain active regardless of the date of issue." An employee who has four active level one coaching plans will be terminated.[9]

Moreover, the Board disregarded undisputed evidence of LPNs disciplining CNAs through coaching plans principally on the basis that Lakeland presented no evidence that a CNA had been terminated as a result of multiple pending level one coachings. For the reasons we discuss above, we reject the notion that the Board may infer solely from the lack of CNA terminations resulting from level one coachings that LPNs are not vested with the authority "effectively to recommend" their termination. Similarly, the fact that CNAs receive "coaching" before receiving other, more serious forms of discipline such as suspension or termination–which may or may not need approval from the "chain of

---

[9] The uncontradicted evidence establishes that LPNs disciplined CNAs on numerous occasions through the level one coaching process.

20

command"–does not make coaching any less of a disciplinary action.[10]  It is plain

_____

[10] The Board also relies on the testimony of Lakeland's Unit Manager, Carol Hiner, who stated that, when she was hired, she was told by Swearingen that "the immediate supervisors needed to be the ones to do the coachings; as far as their disciplinary action, they had to be follow-up [sic] with the chain of command."  On this point, we agree with the reasoning of the Sixth Circuit in Caremore:

> [T]he NLRB relies heavily on the fact that the evaluations and disciplinary notices filed by the LPNs were subject to review by the Administrator.  But the [Act] does not require, for example, that an individual possess authority to fire an employee in order to be considered a supervisor; it is sufficient that the individual has the power "effectively to recommend" that an employee be fired.

129 F.3d at 369.   Furthermore, we note that the Board's analysis ignored unrefuted testimony to the contrary from Baxter on this point–evidence that she, in fact, exercised her independent authority to discipline CNAs:

> Q:    [W]hat information was relayed to you and the other team members as far as the scope of your authority for issuing the coachings?
>
> A:    That we were responsible for those patients on the hall, and that we were responsible for making sure the CNAs did their duties and if not, it was to be addressed.
>
> Q:    So, was it your understanding that you had independent authority to discipline a CNA without being required to involve another level supervisor?
>
> A:    Yes.
>
> Q:    And did you engage in that practice - -
>
> A:    Yes.
>
> Q:    - - during your tenure as a team leader at Wedgewood?
>
> A:    Yes.

21

from the record that there is a nexus between the authority delegated to the LPNs

to issue level one coachings and the discipline, suspension, and effective

recommendation of termination of CNAs.

We also cannot accept the Board's rejection of the testimony establishing

that the LPNs exercise independent judgment in issuing level one coachings solely

on the basis that it was "vague." Lakeland's evidence on this point was neither

refuted nor vague. For example, Baxter, when asked why she believed an LPN did

not ask her permission before issuing a level one coaching, replied:

> A:   Because she knew she had authority to do it. That
>      was her hall and her patient, and it was the aides
>      on that hall that weren't doing what they needed to
>      do.
>
> Q:   So Ms. McQuain did not need your permission to
>      issue a Level 1 coaching to the CNA for not
>      wearing a gait belt?
>
> A:   No.

Likewise, Carol Hiner, Lakeland's Unit Manager, estimated that approximately 70

percent of coaching issued to CNAs are issued and handled solely by LPNs. As

noted above, "the Board cannot ignore the relevant evidence that detracts from its

findings." Northport, 961 F.2d at 1550.

Further, this testimony is consistent with and buttressed by the provisions of

Lakeland's employee manual and the more than 50 level one coaching plans that

22

were introduced into evidence. These documents, which were not contested, objectively refute the Board's position that the issuance of level one coaching plans is merely "routine" or "clerical." The employee manual, for example, describes twenty non-exclusive "examples" of customer service standards, which, if not met, could lead to level one coaching discipline. To list a few, the program requires that employees "[f]ollow the Facility's policy and procedures and Facility's standards of practice," "[a]lways act professional, respectful, and have a positive attitude," "[d]emonstrate flexibility in accepting assignments," "[m]aintain resident confidentiality," and "[a]void disruptive actions or conduct in the workplace . . . ." Naturally, enforcing these standards requires more than merely checking an employee's time sheets and/or reporting his or her misconduct to superiors, as the Board concluded. Enforcement of these standards requires, for example, independent judgment as to what is "respectful," "professional," "flexible," and "disruptive," with respect to the CNAs providing adequate patient care.

The level one coaching forms likewise illustrate how the LPNs exercise independent judgment. As noted above, each form contains a section labeled "Coaching Plan" wherein the employee and the "coach" (an RN or LPN team leader) agree to a plan to help the employee meet Lakeland's customer service

23

standards.  For example, in a coaching plan dated April 6, 2008, which reflects

that the "coach" was an LPN and the "employee" was a CNA, the CNA agreed to

attend a customer service "inservice training" the following week.  The plan

indicates that there would be an additional review in 30 days or earlier, depending

on whether there were any further complaints.  Similarly, a coaching plan dated

September 9, 2008, also prepared by a CNA and an LPN, addresses an instance

wherein a CNA failed to perform her work and act professionally in front of a

patient.  The plan reflects that the CNA and LPN reviewed the customer service

standards together and contains a comment that the CNA "need[s] to display

positive attitude and continue to maintain good rapport [with] residents."  These

and the other plans in the record demonstrate that the LPNs must, in every instance

of discipline (with the exception, perhaps, of attendance violations), perform an

individual evaluation of the CNA's shortcomings and develop a plan addressing

the issue.

On these facts, we find that the Board's conclusion that LPNs do not have

the authority to discipline, suspend, or effectively recommend the termination of

CNAs through level one coaching was not supported by substantial evidence.[11]

---

[11]  The dissent maintains that we "fail[ ] to mention significant testimony that supports the
contrary finding by the Board."  Dissent at 43.  In particular, the dissent cites to the testimony of
Rebecca Ward, an LPN called as a witness by the Board, who testified that she personally did not
consider herself a supervisor, that she has never hired, fired, promoted, or disciplined a CNA,

24

C.    Authority to Responsibly Direct and Assign CNAs

Although we find unreasonable the Board's conclusion that the LPNs

involvement in CNA coaching does not make them supervisors under the Act, for

the sake of thoroughness, we will also consider whether the Board's determination

that the LPNs do not "responsibly direct" and "assign" CNAs is supported by

substantial record evidence.  Lakeland maintains that the LPNs have supervisory

authority because they are accountable for the work of the CNAs under their

supervision and because they assign and reassign CNAs specific tasks and shifts

based upon the needs and conditions of the center, its staff, and its residents.

1.    "Responsibly" Direct

The Board concluded that "the LPN team leaders have the authority to

direct CNAs," noting that, "[t]he LPN team leaders 'oversee the CNA's [sic] job

performance and act to correct the CNAs when they are not providing adequate

care.'" DDE at 33 (citing <u>Golden Crest Healthcare Ctr</u>,  348 NLRB 727, 730

---

and that she has never been instructed that she possesses such authority.  The dissent's reliance on this and similar evidence runs counter to the central reasoning of our decision.  Whether an individual qualifies as a "supervisor" under the Act does not necessarily rest on his or her employer's ability to provide *actual examples* of disciplinary authority.  Rather, as we stress throughout this opinion, the Act directs the Board to evaluate the putative supervisor's <u>authority</u> to discipline, suspend, and effectively recommend the termination of other employees.  Where, as with Rebecca Ward, the record does not reflect that there were adequate opportunities for the putative supervisor to exercise such authority-authority which has been clearly delegated-the frequency with which he or she actually exercises this authority, if ever, is not probative of this central point.

25

(2006) ("Golden Crest")).  The parties likewise do not dispute whether the

exercise of that authority requires independent judgement.  Accordingly, our only

task here is to determine whether the LPNs exercise that discretion

"responsibly."[12]

For guidance on the meaning of  "responsibly," the parties direct us to the

Board's decision in Oakwood.[13]  In Oakwood, the Board held:

> [F]or direction to be 'responsible,' the person directing
> and performing the oversight of the employee must be
> accountable for the performance of the task by the other,
> such that some adverse consequences may befall the one
> providing the oversight if the tasks performed by the
> employee are not performed properly. . . .  Thus, to
> establish accountability for purposes of responsible
> direction, it must be shown that the employer delegated
> to the putative supervisor the authority to direct the work
> and the authority to take corrective action, if necessary.
> It also must be shown that there is a prospect of adverse
> consequences for the putative supervisor if he/she does
> not take these steps.

---

[12] Lakeland devotes a section of its brief to arguing that LPNs' involvement in the performance evaluation process for CNAs is indicative of the LPNs' supervisory status, and directs the Court to extensive record testimony concerning the criteria of the evaluations and the impact of the evaluations on the work of the CNAs.  However, such evidence would establish only that LPNs "direct" CNAs and exercise independent judgment in doing so, not that such direction was "responsible."  Because these issues are not in dispute, consideration of this evidence not required.

[13] Because the term "responsibly" is ambiguous, we defer to the Board's interpretation as long as it is reasonable.  See Cent. Fla. Sheet Metal Contractors Ass'n., Inc. v. NLRB, 664 F.2d 489, 496 (5th Cir. 1981).  All decisions of the former Fifth Circuit announced prior to October 1, 1981, are binding precedent in this circuit.  See Bonner v. Prichard, 661 F.2d, 1206, 1209 (11th Cir. 1981).

348 N.L.R.B. at 691-92. This framework draws a distinction between "those employees whose interests, in directing other employees' tasks, align with management, and those whose interests, in directing other employees, is simply the completion of a certain task." Id. at 692. "In the case of the former, . . . the directing employee will have, if and to the extent necessary, an adversarial relationship with those he is directing." Id.

Lakeland concedes that there is no evidence establishing that an LPN has ever been disciplined or discharged because of his or her failure to supervise CNAs. Nonetheless, Lakeland maintains that to establish that an employee "responsibly" directs another it is not necessary that the employer give specific examples of where "adverse consequences" befell an employee who failed to exercise proper supervision. Lakeland emphasizes that the Act requires only a prospect of adverse consequences. We agree.[14]

---

[14] After the parties filed their briefs, the Board brought to the Court's attention two recent decisions from the Seventh and Third Circuits involving the issue of "responsible direction" under the Act. See Rochelle Waste Disposal, LLC v. NLRB, 673 F.3d 587 (7th Cir. 2012); Mars Home for Youth v. NLRB, 666 F.3d 850 (3d Cir. 2011). In both of these cases, the respective courts upheld the Board's decision finding that the putative supervisors did not responsibly direct other employees. In Mars Home, the Third Circuit noted that "[t]he record before the Board contained numerous examples of where assistant managers were not disciplined for the failure of resident assistants to follow their directions. Rather, the record shows that the assistant managers were disciplined for their own failings as managers." 666 F.3d at 854. In Rochelle Waste, the Seventh Circuit explained that "the Board found no evidence that Jarvis actually suffered as 'adverse consequence' . . . . Where a lower level employee performs inadequately, and the purported supervisor is in fact not held accountable, it highly supports a finding that the purported supervisor is not actually at risk of suffering adverse consequences." 673 F.3d at 596.

27

To begin with, Lakeland's written job description for LPNs strongly indicates that they are accountable for the performance of the CNAs. Under the heading "Leadership," the job description explicitly provides that the LPNs supervise CNAs. Further, the job description explains that the "primary purpose" of LPNs is to "provide direct nursing care to the residents, and to supervise the day-to-day nursing activities performed by nursing assistants." To this end, the job description provides that the "essential duties" of LPNs are, among other things, to "[d]irect the day-to-day functions of the nursing assistants in accordance with current rules, regulations, and guidelines that govern the long-term care facility," "[e]nsure that all assigned nursing personnel comply with the written policies and procedures established by the facility," "[e]nsure that all nursing service personnel are in compliance with their respective job descriptions," and "[m]ake daily rounds of [their] unit/shift to ensure that nursing service personnel are performing their work assignments in accordance with acceptable nursing

---

The Seventh Circuit later added that, "Rochelle Waste does not point to anything in the record that shows that [the purported supervisor was] 'at risk' of an adverse consequence for the poor performance of other employees . . . ." Id. Relying on these and other cases, the Board reasons that the absence in the record of any examples where an LPN was disciplined for the poor performance of a CNA, combined with the numerous examples of coachings that evidence misconduct by CNAs, conclusively establishes that the LPNs do not "responsibly" direct CNAs work. We, however, do not read these cases as holding that actual examples of "responsible" discipline are required under the Act. To the contrary, both Mars Home and Rochelle Waste reaffirm the Board's determination in Oakwood that the Act requires only that the putative supervisor be at risk of suffering adverse consequences for the performance of others.

28

standards . . . ."  (emphasis added).  This evidence, while generally noted in the

background section of the Board's decision, was not considered in its analysis of

responsible direction.

We acknowledge that, standing alone, this "paper" evidence would likely

not be sufficient to support a finding of supervisory status.  Cf. Golden Crest 348

N.L.R.B. at 731 ("But there must be a more-than-merely-paper showing that such

a prospect [of adverse consequences] exists.").  As the Board has properly

recognized, to base supervisory status solely upon a paper showing of titles or job

descriptions would enable employers to design their policies in a manner that

could effectively deprive non-supervisory employees of their right to collective

bargaining under the Act.  This concern, however, does not command an

impossibly high evidentiary standard for establishing "prospective" consequences

for the putative supervisor.  Written policies, job descriptions, performance

evaluations, and the like, when corroborated by live testimony or other evidence,

are obviously relevant to the issue of responsible direction.

In this case, Lakeland presented much more than a "paper showing" of

responsible direction.[15]  Lakeland also presented unrebutted testimony establishing

---

[15] In its brief, the Board relies heavily on Golden Crest to support its conclusion that the evidence presented by Lakeland was insufficient to establish that the LPNs' direction was responsible.  In that case, decided the same day as Oakwood, the Board held that Golden Crest, the employer, failed to establish that its LPNs responsibly directed the CNAs at its facility.

29

that LPNs are "responsible" for ensuring the CNAs' compliance with Lakeland's standards, and that they would be "written up" for failing to do so. For example, Lakeland's Director of Nursing, Swearingen, testified:

> Q:    . . . Can a charge nurse be held responsible for a CNA not doing his or her job?
>
> A:    Yes.
>
> Q:    Have you seen that happen?
>
> A:    No.
>
> Q:    Well, but if there's a problem with patient care, have nurses ever been -- have -- they are held responsible for that?
>
> A:    If they're -- if a charge nurse saw a CNA do something to the resident that was against a standard practice, and I'll give you an example, if they saw a CNA verbally abuse or physically abuse their resident, and if the charge nurse did not have that CNA leave the building, that charge nurse would be responsible, yes.[16]

Golden Crest, like Lakeland, offered no examples, positive or negative, of actions taken as a result of the LPNs' performance in directing the CNAs. Unlike this case, however, the only evidence offered by Golden Crest on the issue of responsible direction consisted of evaluation forms, which, among other factors, rated the LPNs on how well they "[d]irect[] CNAs to ensure quality of care." 348 N.L.R.B. at 731. The Board found that the evaluation forms, standing alone, did not establish the supervisory status of Golden Crest's LPNs.

[16] Swearingen also testified to several other scenarios in which an LPN would be coached for the poor performance of a CNA. For example:

> Q:    If an LPN tells a CNA to turn a resident in a certain manner on this day and the CNA doesn't do it, and the LPN knows

Likewise, Baxter testified:

> Q: If a CNA has been coached that they are doing something improper, not very good at it, bedding, showering, toiletry, whatever, and they don't seem to be improving on it, would an LPN be written up because of the performance of a CNA?
>
> A: If the aide on the hallway is not doing their [sic] job and that nurse is aware that that CNA is not doing their [sic] job?
>
> Q: Uh-huh.
>
> A: Yes, I would write her up.
>
> Q: Have you ever written up an LPN?
>
> A: I have never had to. But I would. They are responsible for that hall.

The Board disregarded this and other areas of testimony as "purely

---

> the CNA didn't do what she was supposed to do, will that LPN be coached?
>
> A: Yes.
>
> Q: If an LPN tells a CNA to groom a resident in a certain manner and the CNA doesn't do it and the LPN knows that, will the LPN be coached?
>
> A: Yes. . . .

31

conclusory." They were not. As noted above, under the Act, an employer may establish "responsible" direction by presenting evidence of prospective consequences. Swearingen's and Baxter's testimony provide specific examples of scenarios in which, they opined, an LPN would be held accountable for the actions of a CNA. Baxter's unrefuted testimony also establishes that an LPN would be held accountable in such a situation through a "write up" (presumably coaching), which, as we note above, is a significant form of discipline. By focusing exclusively on the lack of examples where an LPN "has experienced . . . material consequences to her terms and conditions of employment . . . as a result of his/her performance in directing CNAs,"(emphasis added) the Board effectively ignored its own observation in Oakwood that a showing of prospective consequences is sufficient under the statute.

Applying the framework of Oakwood, we conclude that the record as a whole establishes that the LPNs' interests are "aligned with management" and that the LPNs would be held accountable for the poor performance of their CNAs. There was no evidence directly refuting this accountability. Accordingly, the Board's conclusion that the LPNs do not responsibly direct CNAs was not supported by substantial evidence.

2.      Assignment

Under the Act, the Board has interpreted the term "assign" as referring to "the act of designating an employee to a place (such as a location, department, or wing), appointing an employee to a time (such as a shift or overtime period), or giving significant overall duties, i.e., tasks, to an employee." Oakwood, 348 N.L.R.B. at 689.  "In the health care setting, the term 'assign' encompasses the charge nurses' responsibility to assign nurses and aides to particular patients." Id. It does not encompass a "nurse's ad hoc instruction that the employee perform a discrete task." Id.  Here, the Board concluded that, in terms of assigning duties to CNAs, Lakeland's LPNs assign only "discrete tasks."  The Board also concluded that, while the LPNs are involved in assigning and reassigning CNAs to specific shifts, rooms, and residents, they do not use independent judgment in the exercise of such authority.

a.      *Tasks*

In determining that the LPNs do not assign "significant overall duties" to the CNAs, the Board drew a parallel between this case and an illustration provided in Oakwood.  In Oakwood, the Board noted:

> [I]f a charge nurse designates an LPN to be the person
> who will regularly administer medications to a patient or
> a group of patients, the giving of that overall duty to the
> LPN is an assignment.  On the other hand, the charge

33

> nurse's ordering an LPN to immediately give a sedative
> to a particular patient does not constitute an assignment.

348 N.L.R.B. at 689. Based on this example, the Board concluded that the LPNs' specific assignments to CNAs, such as taking vital signs and preparing residents to visit doctors, were more akin to the Board's example of routine, "discrete tasks" than the giving of an "assignment" under the meaning of that term in the Act.

Lakeland responds that "LPNs assign daily tasks to CNAs that are not routine–they are medical in nature and dependent on the residents' conditions–and change frequently depending upon the resident's individual medical needs and any emergencies that arise." The testimony which Lakeland cites bears this out. However, Lakeland's assertion and the cited testimony only underscore the Board's point: the tasks performed by the LPNs are situational, depending on particular needs as they arise. The record does not demonstrate that LPNs assign "significant overall duties" to LPNs. Therefore, we conclude that the Board's determination on this narrow issue–the assignment of tasks–is supported by substantial evidence.

b. *Scheduling*

Whether the Board was reasonable in concluding that the LPNs do not exercise independent judgment in scheduling CNAs is a different question. The facts material to this issue are not in dispute. Lakeland employs two unit

34

managers who work from 7:15 a.m. until 5:30 p.m., Monday through Friday, and three shift supervisors, two who work overlapping daytime shifts between 12:00 p.m. and 11:00 p.m., Monday through Friday, and a third who works weekends from 7:00 a.m. until 11:00 p.m.  Lakeland's LPNs and CNAs work three shifts, seven days a week:  6:45 a.m. until 3:15 p.m.; 2:45 p.m. until 11:15 p.m.; 10:45 p.m. until 7:15 a.m.  During the third shift, seven days per week, LPNs are the highest-ranking employees on the premises.  The Director of Nursing is on call 24 hours per day, seven days per week, in case of an emergency.

The parties acknowledge that responsibility for staffing and scheduling of CNAs lies, first and foremost, with a staffing coordinator who reports to the Director of Nursing.  The staffing coordinator is charged with preparing the schedule on a monthly basis, as well as "unit shift assignment sheets" for the first and second shifts, Monday through Friday.[17]   The staffing coordinator testified that, in scheduling CNAs, she frequently takes into account requests from LPNs that certain CNAs be assigned (or not be assigned) to their hall.  She added that:

> I don't pick CNAs to work particular halls because I
> don't know how well they work with the nurse or with
> the particular patients on [sic] a certain section.  Only the
> nurses know that.  They work with the CNAs closely.

---

[17]  The assignment sheets set forth, among other things, the unit, date, shift, and room assignments for the LPNs and the CNAs on their respective teams, as well as break and lunch times for each CNA on the team.

That's why we allow them to choose their teammates basically.

On the third shift and weekends, LPNs alone are responsible for preparing the assignment sheets. The record indicates that they do so at least in part based on the information the staffing coordinator has already placed on the assignment sheets. The record also indicates that LPNs, while not principally responsible for transferring CNAs between units, changing room assignments, and reassigning tasks between CNAs, have the authority to do so, and have exercised this authority in the past. Similarly, during the third shift and on weekends, LPNs have the authority to approve or deny CNA requests to leave work before the end of their shift. During the first and second weekday shifts, this authority lies principally with the unit manager, who takes into consideration the recommendation of the respective LPNs.

The crux of this issue is whether, under this arrangement, the LPNs exercise independent judgment in scheduling (or recommending the scheduling of) CNAs to particular shifts, halls, etc., or whether they merely follow existing guidelines and directions while leaving judgment calls to their superiors. We have held that, "for an assignment function to involve independent judgment, the putative supervisor must select employees to perform specific tasks on the basis of a

36

judgment about the individual employee's skills." Cooper/T. Smith, Inc., 177 F.3d at 1265. The Board thus concluded that LPNs are not supervisors in this regard because Lakeland failed to establish that in making scheduling recommendations and modifications the LPNs matched the needs of specific patients with a particular CNA's skills and training. Rather, the Board noted, such decisions appear to be based upon the personal preferences of the LPN or resident involved, or solely to balance the workload among CNAs–neither of which requires independent judgment. The Board was likewise not persuaded by the fact that the third (night) shift LPNs, while the highest-ranking employees on the premises during their shifts, have the independent authority to reassign CNAs in the event of no calls and no shows.

The Board's conclusions find support in the Ninth Circuit's decision in Providence Alaska Medical Center v. NLRB, which, under similar facts, concluded that the employer's charge nurses were not supervisors under the Act. 121 F.3d 548 (9th Cir. 1997). As in this case, the LPNs in Providence did not prepare the CNAs' monthly schedule, but had the authority to assign nurses to particular residents at the beginning of each shift, and to reassign nurses if another nurse was absent or nearing overtime. The Ninth Circuit concluded that the LPNs' assignments were made "within the parameters of the supervisory nurse's monthly

37

assignment schedule" and were a "routine activity that does not require the exercise of independent judgment." Id. at 552.[18]  The Ninth Circuit also concluded that the LPNs' involvement in staffing and scheduling decisions was "more clerical than supervisory." Id. at 553.

At the other end of the spectrum, however, the Fourth Circuit, also under similar facts, concluded that the "power to authorize schedule changes and reassign workers rises above the mere incidental direction of assistants." Glenmark, 147 F.3d at 341.  The Fourth Circuit found persuasive the fact that, "[f]or two out of three shifts during the day, and all three shifts over the weekend, there is no higher authority than the charge nurse . . . ." Id.  The Fourth Circuit explained:

> We cannot fathom the Board's position that for more than two thirds of the week at a nursing home providing twenty-four hour care, where patient conditions can change on a moment's notice, there is no one present at the facility exercising independent judgment regarding proper staff levels and patient assignments.
> . . . .
> The authority to assign workers constitutes the power to put the other employees to work when and where needed.  Such decisions are, in our view, inseverable from the exercise of independent judgment, especially in

---

[18] We cited this reasoning with approval in Cooper, which involved the supervisory status of tug boat docking pilots.  177 F.3d at 1265.  For the reasons that follow, we find that Cooper is distinguishable from this case as to the level of independent judgment exercised by the putative supervisor.

the health care context where staffing decisions can have such an important impact on patient health and well-being.

Id. at 341-42 (internal citations, quotations, and bracketing omitted).

To be sure, the standard adopted by the Fourth Circuit–whether the putative supervisor has the authority "to put the other employees to work when and where needed"–is arguably less rigorous than the standard that we have applied in this circuit, which requires that the supervisor assign work on the basis of the employees' individual skills. Compare id. with Cooper/T. Smith, Inc., 177 F.3d at 1265 (citing NLRB v. KDFW-TV, Inc., 790 F.2d 1273, 1279 (5th Cir. 1986) ("[T]he putative supervisor must select employees to perform specific tasks on the basis of a judgment about the individual employee's skills.") ). However, the thrust of that decision–finding untenable the Board's position that LPNs mechanically follow established procedure in assigning and reassigning CNAs, even when they are the highest-ranking staff on the premises–applies with equal force in this case. As noted by Swearingen, the LPNs "are considered to be leaders of their team." They seek to "assure the best possible care that they can give to those residents or patients that's [sic] in that section by making sure that the CNAs do the job that they're assigned to." Id. In view of this unrebutted evidence, we cannot accept the conclusion that the LPNs, who are charged with

39

"leading" Lakeland's unit teams in order to insure proper patient care, and who are the highest-ranking employees during a third of Lakeland's operations, have the authority to assign and reassign CNAs, but have no real flexibility in doing so. Viewing the record as a whole, we find the Board's determination that the LPNs do not exercise independent judgment in assigning CNAs not supported by substantial evidence.

IV.    CONCLUSION

For these reasons, we GRANT Lakeland's petition for review; the Board's cross-petition for enforcement is DENIED; and the Board's decision is VACATED.

PRYOR, Circuit Judge, dissenting:

"[I]n reweighing the facts and setting aside the Board's order," the majority opinion "improperly substitute[s] its own views of the facts for those of the Board," NLRB v. Enter. Ass'n of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Mach. & Gen. Pipefitters of New York & Vicinity, Local Union No. 638, 429 U.S. 507, 532, 97 S. Ct. 891, 905 (1977), and fails to adhere to our deferential standard of review. As directed by Congress, "[t]his Court reviews the . . . factual findings [of the National Labor Relations Board] to ensure that they are supported by substantial evidence on the record as a whole." NLRB v. Contemporary Cars, Inc., 667 F.3d 1364, 1370 (11th Cir. 2012) (citing 29 U.S.C. § 160(e)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" id. (quoting Bickerstaff Clay Prods. Co. v. NLRB, 871 F.2d 980, 984 (11th Cir. 1989)), but it "is more than a mere scintilla of evidence." Id. "Provided any inferences drawn from the record were plausible, this Court may not overturn the Board's determination even if it would make a different finding under a de novo review." Id. (citing Cooper/T. Smith, Inc. v. NLRB, 177 F.3d 1259, 1261 (11th Cir. 1999)). "This is an exceedingly narrow standard of review designed to allow disruption of the . . . decision [of the Board] only when the [Board] exercises its discretion 'in an

41

arbitrary or capricious manner.'"  Id. (quoting Daylight Grocery Co. v. NLRB, 678 F.2d 905, 908 (11th Cir. 1982)).  Although "a split in the circuits has developed about the degree of deference that should be accorded to the [Board] on its determination that an employee is a 'supervisor' under [section] 2(11) of the [National Labor Relations Act]," Cooper/T. Smith, Inc., 177 F.3d at 1262 n.3, our Court has refused to make "judicial adjustments to [the] statutory standard of review [because] we believe the wiser course is a robust application of the standard that has typified review of Board decisions," id. at 1262.

Substantial evidence in three ways supports the findings by the Board that the licensed practical nurses at Lakeland lack any supervisory authority using independent judgment, 29 U.S.C. § 152(11).  First, substantial evidence supports the finding by the Board that the licensed practical nurses lack the authority to discipline, suspend, or effectively recommend the termination of certified nursing assistants.  Second, substantial evidence supports the finding by the Board that the licensed practical nurses do not responsibly direct certified nursing assistants.  Third, substantial evidence supports the finding by the Board that the licensed practical nurses do not assign certified nursing assistants using independent judgment.

*A. Substantial Evidence Supports the Finding by the Board that the Licensed Practical Nurses Lack the Authority to Discipline, Suspend, or Effectively*

*Recommend the Termination of Certified Nursing Assistants.*

The majority opinion faults the Board for "meticulously exclud[ing] or disregard[ing] record evidence, which, when taken into account, compels" the finding that the licensed practical nurses possess the authority to discipline, suspend, and effectively recommend the termination of certified nursing assistants, Majority Opinion at 9, but the majority opinion fails to mention significant testimony that supports the contrary finding by the Board. Although Lakeland did not call any licensed practical nurses as witnesses to testify at the hearing about whether they possessed supervisory authority, the Board did. The licensed practical nurse the Board called provided unequivocal testimony that the licensed practical nurses neither possess nor exercise supervisory authority.

Rebecca Ward, a licensed practical nurse who had worked as a licensed practical nurse at Lakeland for ten years and was "one of the most senior [licensed practical nurses] at [Lakeland]," testified that she did not consider herself to be a supervisor, and that neither she nor any other licensed practical nurse had attended daily management meetings. Ward had never hired, fired, transferred, or promoted a certified nursing assistant. Ward had never disciplined a certified nursing assistant. Ward had never suspended a certified nursing assistant, and she had never been instructed that she had the right to suspend certified nursing assistants.

43

On one occasion, Ward issued a level one coaching form to a certified nursing assistant who Ward felt "was rude to a resident," but Ward did so only after she discussed the situation with her weekend supervisor, Sharon Stein, who is a registered nurse. Stein "instructed" Ward to issue the level one coaching form to the certified nursing assistant, and both Stein and Ward met with the certified nursing assistant to discuss the form. In the light of Ward's testimony, the Board could have drawn a plausible inference that the licensed practical nurses lack the authority authority to discipline, suspend, or effectively recommend the discharge of certified nursing assistants.

Putting aside Ward's testimony, the evidence that the majority opinion cites to support its conclusion that the licensed practical nurses possess the authority to discipline, suspend, and effectively recommend the termination of certified nursing assistants does not compel that finding. The majority contends, for example, that the testimony of the director or nursing, Gartha Swearingen, establishes that the licensed practical nurses have the power to discipline, suspend, and effectively recommend the discharge of certified nursing assistants, Majority Opinion at 10–12, but a review of Swearingen's testimony establishes that her statements about whether the licensed practical nurses possess that authority using independent judgment were, at best, ambiguous. After counsel for Lakeland

44

provided Swearingen with a copy of the level two coaching form about an incident in which a resident was burned after Tracie Stevens, a certified nursing assistant, allowed the resident to smoke while wearing an oxygen mask, counsel for Lakeland asked questions about the role that the licensed practical nurse who signed the form played in the investigation and termination of Stevens. Swearingen stated that Sheena Smith, the licensed practical nurse, was "involved" in the suspension and termination of Stevens, but Swearingen's testimony does not compel a finding that the licensed practical nurse used independent judgment during her undefined "involvement" with the suspension and termination of Stevens:

> Lakeland: So [Stevens] was suspended, and there was an investigation conducted?
>
> Director of Nursing: Yes, there was.
> . . .
>
> Lakeland: Okay.  Now, what was the role of the [licensed practical nurse] in [Stevens's] case?  In this situation?
>
> Director of Nursing: The [licensed practical nurse] did the termination.
>
> Lakeland: And [the licensed practical nurse] was involved in the termination process?
>
> Director of Nursing: Yes, she was involved in it.
>
> Lakeland: Was [the licensed practical nurse] also involved in the

45

investigation process?

Director of Nursing: Yes, she was.

Lakeland: Now, Kelly Brady's signature is there as well.  Who's that?

Director of Nursing: Yes. She, on 4/13/09, she was the administrator.

Lakeland: Okay.  So she signed off on [Steven's level two coaching form] as well, though, right?

Director of Nursing: Yes.

Lakeland: But it was the [licensed practical nurse] who was involved in both the investigation and the decision to terminate this [certified nursing assistant]?

Director of Nursing: As part of the investigation, yes, [the licensed practical nurse] was involved, yes.

A plausible inference can be drawn from Swearingen's testimony that the licensed practical nurse who signed Stevens's level two coaching form played some role in the investigation, suspension, and termination of Stevens, but Swearingen's testimony does not compel a finding that the licensed practical nurse took an adverse employment action against Stevens using independent judgment.  And even if it did, this isolated incident of a licensed practical nurse playing a role in the suspension of a certified nursing assistant together with the one other similar incident that the director of nursing described, would not have required the Board

46

to find that the licensed practical nurses are supervisors. We have stated that "nearly everyone at one time or another, under some condition, tells someone else what to do, but that one who engages in an isolated incident of supervision is not necessarily a supervisor under the Act." TRW-United Greenfield Div. v. NLRB, 716 F.2d 1391, 1395 (11th Cir. 1983).

Tammy Baxter, a day shift supervisor and registered nurse who had previously performed the same role at Lakeland as the licensed practical nurses, provided more detail regarding the level two coaching form that Smith issued to Stevens, but Baxter's testimony also fails to compel a finding that Smith suspended Stevens using independent judgment:

> Lakeland: Did Ms. Smith relay to you that Ms. Stevens was suspended?
>
> Baxter: Yes. She told me she was suspended.
>
> Lakeland: Okay. Did she relay to you how Ms. Stevens came to be suspended? In other words, she suspended her?
>
> Baxter: I don't remember her saying exactly what happened at the time she was suspended. She just told me that she was suspended and that she wanted her terminated.

The Board was not required to find that the licensed practical nurses at Lakeland are supervisors on the basis of this ambiguous testimony regarding sporadic incidences of discipline by the licensed practical nurses.

In the light of Ward's testimony and the testimony of Swearingen and Baxter, a conflict in the evidence exists about whether the licensed practical nurses possess the authority to discipline, suspend, and effectively recommend the termination of certified nursing assistants, and the Board was entitled to resolve that conflict. The Board drew a plausible inference from this evidence that the licensed practical nurses lack that authority, and our "exceedingly narrow standard of review," Contemporary Cars, Inc., 667 F.3d at 1370, requires us to enforce the order of the Board. But the majority opinion instead substitutes its view of the facts for the contrary finding by the Board.

*B. Substantial Evidence Supports the Finding by the Board that the Licensed Practical Nurses Do Not Responsibly Direct Certified Nursing Assistants.*

The majority opinion maintains that, although no evidence was introduced that a licensed practical nurse at Lakeland has been disciplined or discharged because of her failure to supervise a certified nursing assistant, Lakeland established a "prospect" that licensed practical nurses can be disciplined for failing to direct certified nursing assistants, see Majority Opinion at 27, but the record does not compel a finding of that "prospect." Substantial evidence supports the decision of the Board that Lakeland failed to prove that licensed practical nurses can be held accountable for the actions of the certified nursing assistants.

Although an employer can establish responsible direction by presenting

48

evidence that a purported supervisor faces the prospect of adverse consequences for the actions of a subordinate, see In re Oakwood Healthcare, Inc., 348 NLRB 686, 692 (2006), the Board was presented with evidence that the licensed practical nurses face no prospect of adverse consequences for the failings of the certified nursing assistants. The Board heard evidence that certified nursing assistants had engaged in gross misconduct–for example, Stevens allowed a resident to smoke while wearing an oxygen mask, which led to a serious injury to the resident–but no licensed practical nurse had been held accountable for that misconduct.  As the Seventh Circuit recently explained, "[w]here a lower level employee performs inadequately, and the purported supervisor is in fact not held accountable, it highly supports a finding that the purported supervisor is not actually at risk of suffering adverse consequences." Rochelle Waste Disposal, LLC v. NLRB, 673 F.3d 587, 596 (7th Cir. 2012).  A reasonable mind would expect that the licensed practical nurse who was allegedly accountable for Stevens's misconduct would have faced some adverse consequence for not preventing the serious injury to the resident who had smoked while wearing an oxygen mask. The Board was entitled to draw a plausible inference that, because no licensed practical nurse had been held accountable for that misconduct, the licensed practical nurses at Lakeland do not responsibly direct the certified nursing assistants.  But the majority opinion instead

49

substitutes its view of the facts for the contrary finding by the Board.

*C. Substantial Evidence Supports the Finding by the Board that the Licensed Practical Nurses Lack the Authority to Assign Certified Nursing Assistants Using Independent Judgment.*

The majority opinion provides no persuasive support for its conclusion that the licensed practical nurses exercise independent judgment in scheduling certified nursing assistants. "[F]or an assignment function to involve independent judgment, the putative supervisor must select employees to perform specific tasks on the basis of a judgment about the individual employee's skills." Cooper/T. Smith, Inc., 177 F.3d at 1265. The parties do not dispute that the "responsibility for staffing and scheduling of [certified nursing assistants] lies, first and foremost, with a staffing coordinator who reports to the Director of Nursing," Majority Opinion at 35, and that, when the licensed practical nurses prepare assignment sheets on the weekend "they do so at least in part based on the information the staffing coordinator has already placed on the assignment sheets." Id. at 36. But the majority opinion nevertheless concludes that the licensed practical nurses use independent judgment to assign certified nursing assistants.

The majority opinion "find[s] untenable the Board's position that [the licensed practical nurses] mechanically follow established procedure in assigning and reassigning [certified nursing assistant], even when they are the

50

highest-ranking staff on the premises," Majority Opinion at 39, but this reasoning fails. "Although on the . . . night . . . shifts the licensed practical nurses are the highest-ranking employees on the premises, this does not ipso facto make them supervisors." NLRB v. Res-Care, Inc., 705 F.2d 1461, 1467 (7th Cir. 1983), abrogated on other grounds by NLRB v. Health Care & Ret. Corp. of Am., 511 U.S. 571, 114 S. Ct. 1778 (1994). "A night watchman is not a supervisor just because he is the only person on the premises at night . . . ." Id. The majority opinion reasons that the licensed practical nurses must exercise independent judgment to assign certified nursing assistants when they are the highest-ranking staff on the premises because Swearingen testified that licensed practical nurses "are considered to be leaders of their team," Majority Opinion at 39 (citation and internal quotation marks omitted), but that vague testimony did not compel the Board to find that the licensed practical nurses have the authority to assign certified nursing assistants using independent judgment. Although the licensed practical nurses were sometimes the highest-ranking staff on the premises, the record establishes that the "Director of Nursing is on call 24 hours per day, seven days per week," Majority Opinion at 35, and it is undisputed that the scheduling coordinator exercised the primary authority for scheduling certified nursing assistants. Based on this evidence, the Board was entitled to draw the plausible

51

inference that the licensed practical nurses do not exercise independent judgment in scheduling certified nursing assistants. But again the majority substitutes its view of the facts for the contrary finding by the Board.

For all the foregoing reasons, I respectfully dissent. Our standard of review bars us from reweighing the evidence. I would deny the petition for review and enforce the order of the Board because substantial evidence supports its findings.